1
2
3
4
5
6

DISTRICT COURT JUDGE BENJAMIN H. SETTLE
MAGISTRATE JUDGE DAVID W. CHRISTEL

7

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

8

9   CHARLES REED,

10                              Plaintiff,

11          v.

12   STEVEN HAMMOND, et al.,

13                              Defendants.

14

NO.  3:16-CV-05993-BHS-DWC

DEFENDANTS' THIRD MOTION
FOR SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR:
October 2, 2020

ORAL ARGUMENT REQUESTED

15          **I.      INTRODUCTION**

16          Plaintiff Reed cannot show any of the Defendants—Dr. Hammond, Dr. Strick, Mr.

17   Weber, or Dr. Smith—violated his Eighth Amendment rights. Further, the Defendants are

18   entitled to qualified immunity because no clearly established precedent established their

19   conduct, which was consistent with Washington State Department of Corrections' treatment

20   protocols and their own medical judgment, would violate Reed's constitutional rights. Reed

21   presented no evidence to Defendants at the time to suggest he was experiencing extrahepatic

22   conditions indicating that his disease was rapidly progressing or that a failure to provide

23   immediate treatment would result in injury or serious risk to his health. Likewise, Defendants

24   enjoy qualified immunity for Reed's medical negligence claims under Washington law

25   because they acted reasonably while performing statutory duties pursuant to policy. Finally,

26   Reed cannot establish any Defendant's alleged negligence proximately caused him injury.

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

1

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    Defendants respectfully request the Court grant their motion and summarily dismiss

2    Reed's Second Amended Complaint, (Dkt. #96), in its entirety, with prejudice.

3                    II.    STATEMENT OF THE CASE

4    Plaintiff Charles Reed is an inmate held by the Washington State Department of

5    Corrections (DOC) at Stafford Creek Corrections Center (SCCC) in Aberdeen, Washington.

6    (Dkt. #96 at 2, ¶ 5). He has had Hepatitis C (HCV) since 1979. (Dkt. #42 at 2, ¶ 6).

7    **A.    Natural History of HCV**

8    HCV is a viral infection that can slowly damage the liver over time. (Dkt. #43 at 4, ¶ 8).

9    There are usually no significant symptoms for 3-4 decades after initial infection. *Id*. During this

10   time, HCV can cause progressive "fibrosis" or scarring of the liver; the most advanced stage

11   being "cirrhosis." *Id*. Serious clinical consequences of HCV, such as symptoms of liver

12   dysfunction, overt liver failure, liver cancer, and death, occur in only 1-4% of patients with

13   cirrhosis annually. *Id*. However, the progression to cirrhosis is a variable process, with only 20-

14   30% of people with HCV progressing to cirrhosis over a 20-year period. (Dkt. #43 at 4-5, ¶ 9).

15   Some persons, despite HCV, never develop any scarring of the liver. *Id*.

16   In HCV patients, it is difficult to determine clinically the amount of scarring in the liver

17   because the scarring does not usually cause symptoms until it is very advanced and has nearly

18   replaced all the normal tissue. (Dkt. #43 at 5, ¶ 10). A liver biopsy, a procedure using a needle

19   to obtain several small pieces of liver for microscopic examination, is the "gold standard" for

20   assessing the degree of fibrosis. *Id*. Liver fibrosis is graded on a scale from F0 to F4: "F0" means

21   no scarring; "F1" means mild scarring; "F2" means moderate scarring; "F3" means severe

22   scarring; and "F4" means very severe scarring/cirrhosis. (Dkt. #43 at 5-6, ¶ 10, Table 1).

23   **B.    Treatment of HCV by DOC**

24   The DOC Offender Health Plan (OHP) defines the level and scope of medical care

25   provided to individuals in DOC custody. (Dkt. #109 at 2-3, ¶ 5; Dkt. #109-1). The OHP defines

26   three Levels of Care: Level 1 – medically necessary; Level 2 – medically necessary in some

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

2

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1  instances and must be reviewed and approved by a Care Review Committee (CRC); and Level
2  3 – not medically necessary and not authorized. *Id.*

3        The OHP lists HCV as Level 1 condition "under DOC protocol." (Dkt. #109 at 3, ¶ 6;
4  Dkt. #109-1 at 21). DOC Policy 670.000, Communicable Disease, Infection Prevention, and
5  Immunization and the DOC HCV protocol are documents that guide decision-making for HCV
6  within DOC. (Dkt. #43 at 2, ¶ 3; Dkt. #43-1 at 2-9; Dkt. #43-1 at 11-31). When initial treatment
7  decisions were made in Reed's case, treatment with Direct Acting Anti-virals (DAAs) was
8  selectively deferred for patients with lower levels of fibrosis, prioritizing DAA treatment for
9  patients with more severe fibrosis. (Dkt. #109 at 3, ¶ 6).

10        In order to apply the DOC protocol, a specific Hepatitis C Care Review Committee (HCV
11  CRC) was created. (Dkt. #109 at 3, ¶ 6). The HCV CRC is composed of practitioners presenting
12  or discussing care of patients with HCV. *Id.* At HCV CRC meetings, the patient's provider
13  summarizes the patient's history, diagnosis, exam findings, symptoms, and other information
14  relevant to the use of DAAs per the HCV protocol. (Dkt. #109 at 3, ¶ 7). The CRC then discusses
15  each case presented determines the prioritization or deferral in each case. *Id.*

16  **C.**    **Treatment of Reed's HCV Infection at SCCC**

17        Reed arrived at SCCC most recently in August 2014. (Dkt. #71 at 2, ¶ 5). His SCCC
18  provider scheduled him for a liver biopsy that showed that Reed's fibrosis score was an F2. *Id.*
19  Under the DOC HCV Protocol, patients, like Reed, whose treatment with DAAs was deferred
20  were to be rescreened annually with an AST to Platelet Ratio Index (APRI) score and offered a
21  liver biopsy every five years or as appropriate. (Dkt. #70 at 4, ¶ 8). This ongoing monitoring for
22  progression of liver disease allowed treatment to be initiated before any untoward effects or
23  complications occur. *Id.* Prior to 2016, Reed's APRI scores were relatively low compared to
24  others with higher levels of fibrosis, so nothing indicated his disease had progressed to an F3 or
25  F4 fibrosis score. (Dkt. #71 at 3-4, ¶ 7). Reed's reported symptoms were generally inconsistent
26  with HCV extrahepatic manifestations so there was no indication for immediate treatment with

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

3

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1   DAAs. *Id*. Nevertheless, upon Reed's request, DOC Nurse Eschbach, the infectious disease

2   control nurse at SCCC, presented Reed's case to the HCV CRC on January 7, 2016. (Dkt. #71

3   at 1, ¶ 2, at 3-4, ¶ 7). According to Dr. Hammond, DOC's then Chief Medical Officer, who

4   attended that HCV CRC meeting, nothing at the time of the HCV CRC presentation indicted that

5   Reed's infection was progressing faster than normal or that he was experiencing any extrahepatic

6   conditions warranting another biopsy. (Dkt. #109 at 2, ¶3, at 4, ¶ 10).

7        Reed then submitted grievances through the prison grievance system, and he sent letters

8   to both Dr. Hammond and Dr. Strick complaining about not being provided DAAs. (Dkt. #109

9   at 4-6, ¶¶ 12-15; Dkt. #109-1 at 52-62; Dkt. #70 at 2-3, ¶ 5; Dkt. #51 at 67-68, 71-72).

10       By late October 2016, the DOC HCV Protocol was revised to recommend treatment with

11   DAAs for all patients with fibrosis scores of F2 or greater. (Dkt. #71 at 4-5, ¶ 8). Because Reed's

12   APRI scores were still relatively low, he was evaluated after other patients with F2 fibrosis scores

13   with APRI scores indicating more advanced scarring. (Dkt. #71 at 5, ¶ 9). On June 20, 2017,

14   DOC provided Reed with a Fibroscan, a less invasive diagnostic technique than a liver biopsy

15   used to evaluate HCV patients for fibrosis. (Dkt. #70 at 5-6, ¶ 11; Dkt. #71 at 5, ¶ 10).

16   Unexpectedly, it showed his HCV infection may have progressed to the equivalent of an F4,

17   making him a high priority for treatment. (Dkt. # 71 at 5, ¶ 10). After receiving the results, Nurse

18   Eschbach continued to progress Reed through the steps of the protocol, and Reed began

19   treatment with DAAs in early November 2017, completing treatment as scheduled twelve weeks

20   later. (Dkt. #71 at 5, ¶ 10, at 6, ¶ 12). Fortunately, Reed's liver condition is compensated,

21   meaning he does not have symptoms related to cirrhosis. (Dkt. #71 at 5, ¶ 10).

22       According to Defendants' expert, Dr. Chad Zawitz, M.D., Defendants' deferral of

23   treatment for early stage fibrosis with ongoing interval monitoring was consistent with the

24   general practice in the community-at-large at that time, including American Association for the

25   Study of Liver Disease/Infectious Diseases Society of America (AASLD/IDSA) and Federal

26   Bureau of Prisons (FBOP) Guidelines. (Dkt. # 156-1 at 25). Dr. Zawitz also states while Reed

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

4

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    may have experienced extrahepatic symptoms associated with HCV, they are not of the nature

2    outlined or implied in the DOC HCV protocol and they are not the type of extrahepatic symptoms

3    that indicated rapid progression. (Dkt. #156-1 at 26). Drs. Zawitz, Strick, Hammond, and Kariko

4    all testify the care Reed received was not below the accepted standard of care. (Dkt. #156-1 at

5    26; Dkt. # 70 at 7, ¶ 15; Dkt. #109 at 7, ¶ 18; Dkt. #110 at 4, ¶ 12).

6        On November 27, 2019, by agreement of the parties, Reed was provided with a diagnostic

7    test that is similar to a Fibroscan called shear wave elastography. (Dkt. #156-1 at 18). The results

8    showed the appearance of Reed's liver was consistent with advanced fibrosis, but there were no

9    focal masses that would be consistent with hepatocellular cancer. *Id*.

10   **D.    Defendants' Actions**

11       Dr. Hammond and Dr. Strick, the only Defendants present at the January 7, 2016, HCV

12   CRC meeting that considered Reed's status, have testified the symptoms Reed claimed to have

13   at that time did not indicate that his infection was progressing rapidly. (Dkt. #70 at 1-2, ¶ 3; Dkt.

14   #111 at 4 , ¶ 6; Dkt. #109 at 4, ¶¶ 10-11; Dkt# 109-1 at 50-51).

15       Although Dr. Hammond and Dr. Strick received letters from Reed claiming he was being

16   denied needed medical care, they have opined the symptoms Reed claimed to have in these

17   grievances and letters were either not related to HCV or were non-specific symptoms that could

18   be associated with many other conditions. (Dkt. #109 at 4-6, ¶¶ 12-15; Dkt. #109-1 at 52-62;

19   Dkt. #70 at 2-3, ¶ 5; Dkt. #51 at 65-72). Defendant Weber does not recall being involved in

20   responding to Reed's grievances about HCV treatment. (Dkt. #111 at 3, ¶ 9).

21       Although Reed complains of a lack of monitoring in 2016, it is undisputed he received

22   APRI testing in December 2015 and January 2017—thirteen months apart vice the twelve month

23   period in the DOC HCV protocol. (Dkt. #70 at 5-6, ¶¶ 11-12; Dkt. #71 at 3, ¶ 6). Dr. Strick and

24   Nurse Eschbach both testified the thirteen-month gap between Reed's APRI tests was not

25   clinically significant compared to the twelve-month gap in the protocol. (Dkt. #70 at 6, ¶ 12;

26   Dkt. #71 at 2-3, ¶¶ 6-7). Of greater significance to this motion, however, is the undisputed

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC                    5                    ATTORNEY GENERAL OF WASHINGTON
                                                                          Corrections Division
                                                                           PO Box 40116
                                                                      Olympia, WA 98504-0116
                                                                           (360) 586-1445

1   testimony that none of the Defendants' roles within DOC included "monitoring" Reed's HCV,

2   a task that was generally the responsibility of an infectious disease nurse at each DOC facility.

3   (Dkt. #109 at 6, ¶ 16; Dkt. #70 at 1-2, ¶ 3, at 4, ¶ 9; Dkt. #110 at 3, ¶ 10; Dkt. #111 at 2, ¶ 5).

4       With respect to the October 2016 protocol change for HCV treatment priorities, it is

5   undisputed the Defendants were not involved in deciding whether to conduct a review of Reed's

6   care, but they did not contemplate the protocol change to require the undertaking of a

7   retrospective review of HCV cases that did not otherwise suggest a rapid progression of the

8   disease. (Dkt. #109 at 6-7, ¶ 17; Dkt. #110 at 3, ¶¶ 8-9; Dkt. #70, at 1-2, ¶ 3; Dkt. #111 at 2,

9   ¶¶ 4-5). This type of review was not contemplated because HCV is normally very slow to

10   progress, meaning a massive review like that suggested by Reed was neither realistic nor

11   medically necessary. (Dkt. #109 at 6-7, ¶ 17; Dkt. #110 at 3, ¶¶ 8-9).

12       Finally, Reed's allegation the Defendants should have used alternative tests and

13   procedures like the Fibroscan ignores the fact that the APRI score used to monitor Reed's HCV

14   progression, as well as other inmates diagnoses with HCV, is among the best-validated

15   laboratory methods for predicting HCV progression and is well-suited for annual monitoring of

16   a large population in a prison setting. (Dkt. #70 at 4, ¶ 10).

17   **E.     Reed Failed to Exhaust DOC's Offender Grievance Program**

18       The Washington Offender Grievance Program (OGP), in existence for nearly forty years,

19   allows inmates to file grievances on a wide range of issues related to their incarceration. (Dkt.

20   #44 at 1, ¶ 3, at 2, ¶ 5). Each facility manages its grievance program in accordance with DOC

21   550.100, OGP, and the OGP Manual, (Dkt. #44 at 1, ¶ 3; Dkt. #44-1, at 2-5, 8-40), copies of

22   which are available to inmates for review in the library or law library. (Dkt. #44 at 2, ¶ 4). Since

23   March 2005, offenders have 20 working days from the date of an incident to file a grievance.

24   (Dkt. #44 at 3-4, ¶ 9). The OGP Manual requires offenders to identify the names of all individuals

25   involved in the incidents described in their grievances and make a simple, straightforward

26   statement about what happened and what they are grieving. (Dkt. #44-1 at 21).

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

6

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Reed was very familiar with the requirements of the OGP, having filed at least 113 grievances since January 2001. (Dkt. 44 at 4, ¶ 12). Reed listed Grievance Log Id. 16602604 as the grievance resolution for any grievances concerning facts relating to this case in Appendix 2 to his Amended Complaint. (Dkt. #8 at 2, 8-11). He filed that grievance in January 2016 and appealed the response to the highest level, Level III. (Dkt. #44 at 4, ¶ 13; Dkt. #44-1 at 42-43). In that grievance, Reed made no allegations against Defendant Weber. (Dkt. #44 at 5, ¶ 15.)

Reed has admitted he did not grieve the following:  (1) the use of APRI scores to monitor his condition; (2) the failure to provide an APRI test in 2016 as called for by the HCV protocol; or (3) the failure to initiate a review of HCV treatment priorities following the protocol change in October 2016. (Dkt. #156-3 at 153:2-154:25, 157:2-10). Regarding the "failure to initiate a review" claim, Reed testified he became aware of the protocol change in October 2016 when Defendants filed their first Motion for Summary Judgment on September 17, 2017. (Dkt. #156-3 at 106:5-24, 157:2-17; Dkt. #40). He did not file a grievance regarding those allegations after becoming aware of the protocol change. (Dkt. #156-3 at 152:4-153:1). Reed's only grievances related to the allegations in this lawsuit were in his December 2017 declaration, Exhibit 15 to his deposition. (Dkt. #156-3 at 151:12-153:1; Dkt. #51 at 76-80, 82-84, 86-88, 90-92, 94-96).

### III.   ISSUES PRESENTED

1.      Should the Court summarily dismiss Plaintiff's civil rights claims because the Defendants are entitled to qualified immunity?

2.      Should the Court summarily dismiss Plaintiff's state law claim for medical negligence because Plaintiff cannot establish the elements of that claim?

### IV.   SUMMARY JUDGMENT STANDARD OF REVIEW

The Court may properly grant summary judgment when the moving party demonstrates there are no genuine issues of material fact for trial and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Conclusory or speculative allegations do not raise genuine issues of material fact for trial. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). The non-

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

7

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    moving party must "produce at least some significant probative evidence tending to support"

2    their position. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). They

3    cannot "defeat summary judgment with allegations in the complaint, or with unsupported

4    conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112

5    (9th Cir. 2003). "The mere existence of a scintilla of evidence in support of the non-moving

6    party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square

7    D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

8                                   **V.    ARGUMENT**

9    **A.    All Defendants Are Entitled to Qualified Immunity**

10        The Defendants are all entitled to qualified immunity because Reed cannot show, "first,

11   [that he] suffered a deprivation of a constitutional or statutory right; and second [that such] right

12   was 'clearly established' at the time of the alleged misconduct." *Taylor v. Barkes,* 135 S. Ct.

13   2042, 2044 (2015) (per curium) (internal quotation marks omitted). The Court may undertake

14   the two-part analysis in either order. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). Qualified

15   immunity defeats Reed's federal claims if the Defendants prevail on either part. *Id.*

16        **1.    Defendants did not deprive Reed of a constitutional right**

17        A prisoner plaintiff claiming an Eighth Amendment violation due to a medical

18   condition must show deliberate indifference to a serious medical need. *Estelle v. Gamble*,

19   429 U.S. 97, 103 (1976). Deliberate indifference to a serious medical need requires an

20   official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v.*

21   *Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference requires more culpability than

22   ordinary lack of due care for a prisoner's health. *Id.* at 835. A court's inquiry must focus on

23   what the prison official *actually* knew, not what the official should have known. *See Wallis*

24   *v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995). Deliberate indifference is a high legal

25   standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). It is comparable to criminal

26   recklessness, and is shown by "something approaching a total unconcern for [the plaintiff's]

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC                    8                ATTORNEY GENERAL OF WASHINGTON
                                                                      Corrections Division
                                                                       PO Box 40116
                                                                   Olympia, WA 98504-0116
                                                                       (360) 586-1445

welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir. 1992); *Schaub v. VonWald*, 638 F.3d 905, 933–34 (8th Cir. 2011) (Plaintiff bears the burden of proving the defendant's mental state was akin to criminal recklessness: disregarding a known risk to the inmate's health.). A failure or refusal to provide medical care is an Eighth Amendment violation only under exceptional circumstances approaching failure to provide care at all. *Shields v. Kunkel*, 442 F.2d 409, 410 (9th Cir. 1971).

The Eighth Amendment standard requires proof of both objective and subjective components. *Hudson v. McMillian*, 503 U.S. 1 (1992). First, the deprivation alleged must objectively be sufficiently serious that it results in a denial of the "minimal civilized measures of life's necessities." *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). To prove this objective component, an inmate must establish (1) there was some degree of actual or potential injury and (2) society considers the acts or omissions of which the plaintiff complains to be so grave that exposing anyone to the acts or omissions, unwillingly, violates contemporary standards of decency. *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Estelle,* 429 U.S. at 97.

Second, the subjective component requires that the prison official possess a sufficiently culpable state of mind: "deliberate indifference to inmate health and safety." *Farmer*, 511 U.S. at 834-36. With regard to deliberate indifference, a prison official is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. If either components is not established, the court need not inquire as to the existence of the other. *Helling*, 509 U.S. at 35.

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

9

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

a.   <u>Drs. Hammond and Strick were not deliberately indifferent because they had no evidence that Reed's condition was rapidly progressing</u>

Reed alleges both Dr. Strick and Dr. Hammond, "personally participated in denying Reed medical treatment as a member of the CRC that denied medical treatment to Reed." (Dkt. #96 at 7-8, ¶¶ 26-27). This argument fails because (1) a difference in medical opinion is insufficient to establish a constitutional violation, (2) no excessive risk to Reed's safety was ignored, and (3) negligence or mistake is insufficient to establish a constitutional violation.

It is well established that, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel,* 681 F.3d 978, 987 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard,* 744 F.3d 1076, 1083 (9th Cir. 2014); *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) ("a mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference,'" (quoting *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996))).

Drs. Hammond and Strick have testified the symptoms Reed claimed to have did not, in their medical opinions, indicate his infection was progressing rapidly. (Dkt. #109 at 4, ¶¶ 10-11; Dkt. #70 at 2-3, ¶ 5). As Dr. Strick opined, "[Reed's] case was presented to the CRC in 2016 and then again in 2017. Each time, the CRC considered the individual facts and circumstances of his case in order to determine whether treatment with DAAs was medically necessary given the information known by the HCV CRC at the time." (Dkt. #70 at 7, ¶ 15). Further, Dr. Strick explained, "[d]eferring his treatment until 2017 was a medically acceptable approach to treatment of his condition given the information known to his providers between 2014 and 2017." *Id*. Although Reed believes his claimed symptoms demonstrated his infection was progressing faster than normal, his difference of opinion with Drs. Hammond and Strick does not constitute a genuine issue of material fact for purposes of his Eighth Amendment claim.

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

10

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    Drs. Hammond and Strick can be found to have acted with deliberate indifference "only

2    if [they] know[] of and disregard[] an excessive risk to inmate health and safety."' *Toguchi,* 391

3    F.3d at 1057. "Under this standard, the prison official must not only 'be aware of facts from

4    which the inference could be drawn that a substantial risk of serious harm exists,' but that person

5    '*must also draw the inference*.'" *Id.* (quoting *Farmer,* 511 U.S. at 837) (emphasis supplied)).

6    "'If a [prison official] should have been aware of the risk, but was not, then the [official] has not

7    violated the Eighth Amendment, no matter how severe the risk.'" *Toguchi,* 391 F.3d at 1057

8    (quoting *Gibson,* 290 F.3d at 1188). "This 'subjective approach' focuses only 'on what a

9    defendant's mental attitude actually was.'" *Toguchi,* 391 F.3d at 1057 (quoting *Farmer,* 511 U.S.

10   at 839).

11   Neither Dr. Hammond nor Dr. Strick *actually drew the inference* from Reed's claimed

12   symptoms that his disease might be progressing more rapidly than expected or that, based on the

13   information available at the time, deferring treatment with DAAs would expose Reed to a serious

14   risk of harm. Accordingly, Reed cannot show they acted with deliberate indifference, and his

15   Eighth Amendment claim regarding the January 7, 2016 CRC decision fails as a matter of law.

16   Even if Drs. Hammond and Strick were mistaken about the import of Reed's claimed

17   symptoms, Reed could not state an Eighth Amendment claim. In *Estelle*, the seminal case

18   establishing the contours of the Eighth Amendment in prisoner medical cases, the Supreme Court

19   stated:

20           [A]n inadvertent failure to provide adequate medical care cannot be said to
             constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to
21           the conscience of mankind." Thus, a complaint that a physician has been
             negligent in diagnosing or treating a medical condition does not state a valid claim
22           of medical mistreatment under the Eighth Amendment. Medical malpractice does
             not become a constitutional violation merely because the victim is a prisoner.
23

24   *Estelle v. Gamble*, 429 U.S. at 105–06. Following upon *Estelle*, the Ninth Circuit has also held,

25   "[m]ere negligence in diagnosing or treating a medical condition, without more, does not violate

26   a prisoner's Eighth Amendment rights." *Toguchi*, 391 F.3d at 1057. In this case, neither Dr.

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC                    11                    ATTORNEY GENERAL OF WASHINGTON
                                                                            Corrections Division
                                                                            PO Box 40116
                                                                            Olympia, WA 98504-0116
                                                                            (360) 586-1445

Hammond nor Dr. Strick were negligent, but even if they were, Reed's Eighth Amendment claims against them fail as a matter of law.

        b.    <u>Nothing contained in Reed's grievances or letters establishes a constitutional violation</u>

First, Reed has no constitutional interest in his ability to participate in a grievance, his ability to send letters to prison officials, or in the responses to either. As stated by one Ninth Circuit District Court, "because plaintiff has no constitutional right to a prison grievance procedure at all . . . [he or she,] therefore[, has] no right to a particular outcome." *Simmons v. Kernan,* No. 2:17-CV-0629 CKD P, 2017 WL 1354841, at *2 (E.D. Cal. Apr. 6, 2017) (citing *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003)). Thus, while Reed claims that Dr. Strick, Dr. Hammond, and Weber somehow violated Reed's constitutional rights by being "involved" in the grievance process, this is insufficient to show a constitutional violation. (Dkt. #96 at 7-9, ¶¶ 26-28). Reed also claims Drs. Hammond and Strick were deliberately indifferent because they received notices [letters] indicating that Reed was being denied needed medical care but did not act upon his demands. (Dkt. #96 at 7-8, ¶¶ 26-27). Nothing in those letters put either doctor on notice Reed's condition had rapidly progressed and denying treatment would constitute ignoring a serious risk to his health, thus those letters do not further his Eighth Amendment claims.

Moreover, it is undisputed Dr. Strick and Weber did not personally participate in Reed's grievance process, a requirement for finding liability under § 1983. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Weber testified, "I do not recall being involved in responding to Reed's grievances regarding Hepatitis C treatment." (Dkt. #111 at 3, ¶ 9). Dr. Strick testified, "My only involvement with the Plaintiff Charles Reed's care has been to participate in meetings of the Hepatitis-C Care Review Committee (CRC) when treatment decisions about his care for Hepatitis C (HCV) have been discussed." (Dkt. #70 at 1-2, ¶ 3).

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

12

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1      c.    <u>Reed cannot establish a cognizable claim that Defendants were</u>
2             <u>deliberately indifferent by not "monitoring" his conditions in 2016</u>

It is undisputed that none of the Defendants were personally responsible for monitoring Reed's condition in 2016. Even if they were, the delay of one month in monitoring his condition fails to show a constitutional violation in the absence of evidence that monitoring at month twelve, rather than month thirteen, would have provided notice of serious risk to Reed's health.

To hold a defendant liable for damages in a § 1983 claim, the wrongdoer must personally cause a constitutional violation. *Leer*, 844 F.2d at 633. "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation. *Id.* Furthermore, § 1983 defendants cannot be held liable based on a *respondeat superior* theory of liability. *Peralta v. Dillard,* 744 F.3d 1076, 1085 (9th Cir. 2014).

Here, each of the medically-trained Defendants stated they were not involved in or responsible for "monitoring" or not "monitoring" Reed's HCV infection. (Dkt. #109 at 6, ¶ 16; Dkt. #70 at 1-2, ¶ 3; Dkt. #110 at 3, ¶ 10). Instead, monitoring HCV patients was accomplished by having an infectious disease nurse and/or the primary provider at the patient's facility use the HCV treatment eligibility evaluation form to re-evaluate annually. (Dkt. #70 at 4, ¶ 9). Weber is not a trained healthcare clinician, so logically he would not have been qualified to "monitor" Reed's condition. (Dkt. #111 at 2, ¶ 3). For these reasons, Reed cannot establish the required element of personal participation in any lack of monitoring of his condition in 2016.

Regardless, any failure to monitor Reed's condition in 2016 would not have put Defendants on notice that Reed's infection was progressing rapidly. As previously established, in order for Reed to establish an Eighth Amendment claim for failure to monitor, he must

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC          13          ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

demonstrate the Defendants had actual knowledge of sufficient facts to support an inference that Reed was at a substantial risk of serious harm *and* the Defendants must have actually drawn that inference. *Toguchi,* 391 F.3d at 1057. Reed was provided evaluations with APRI scores every year except 2016. But the gap between the last APRI score in 2015 and the first APRI score in 2017 was only thirteen months. This one-month gap is not clinically significant relative to the protocol standard of every twelve months. (Dkt. #70 at 6, ¶ 12). This is confirmed by Nurse Eschbach who stated, "While the protocol calls for evaluations at least annually, there is a 13 month lag between his [Reed's] evaluations with APRI scores between December 23, 2015 and January 31, 2017. I do not believe this 13 month gap was clinically significant as compared to the standard of 12 months." (Dkt. #71 at 2-4, ¶¶ 6-7). Moreover, Reed's APRI scores decreased between December 2015 (0.78) and January 2017 (0.54), thus any monitoring conducted in December 2016 would not have suggested Reed's condition was rapidly progressing. (Dkt. #71 at 2-2, ¶ 6). The objective APRI test results between December 2016 and January 2017 demonstrated no progression of Reed's infection, and certainly not the rapid progression that would have prompted a different course of treatment. Thus, the one-month delay in monitoring Reed's condition is insufficient to show an Eighth Amendment violation.

d.   <u>Defendants did not violate the Eighth Amendment by failing to conduct a review of treatment priorities</u>

Reed alleges all of the Defendants violated the Constitution by "failing to initiate review of patient treatment priorities for Hepatitis C following a protocol change in October 2016 that would have resulted in Reed receiving needed medical treatment sooner than he otherwise did." (Dkt. #96 at 7-9, ¶¶ 26-29, at 11, ¶ 39). This allegation clearly sounds in negligence, which does not state an Eighth Amendment claim. *Estelle,* 429 U.S. at 105–07 (whether additional diagnostic techniques or forms of treatment were indicated "is a classic example of matter for medical judgment," which may be medical malpractice but "does not represent cruel and unusual punishment."); *Toguchi,* 391 F.3d at 1057 ("'Mere negligence in diagnosing or treating a medical

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

14

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

condition, without more, does not violate a prisoner's Eighth Amendment rights.' *McGuckin,* 974 F.2d at 1059 (alteration and citation omitted).").

Moreover, none of the Defendants knew of any risk that would warrant such a review or even contemplated such a review. (Dkt. #109 at 6-7, ¶ 17; Dkt. #110 at 3, ¶¶ 8-9; Dkt. #111, at 2, ¶¶ 6-7). As explained previously, Dr. Strick's "only involvement with the Plaintiff Charles Reed's care has been to participate in meetings of the Hepatitis-C Care Review Committee (CRC) when treatment decisions about his care for Hepatitis C (HCV) have been discussed." (Dkt. #70, at 1-2, ¶ 3). Therefore, she also did not know of a need and deliberately choose not to conduct a review as imagined by Reed. Based on the declarations of all of the Defendants on this issue, it is also apparent that none of them personally participated in not conducting a review, another basis for dismissing this claim. *Leer,* 844 F.2d at 633.

> e.     Plaintiff's Fibroscan claim fails under existing Supreme Court precedent

Reed's allegation that DOC should have used tests and procedures available to it, such as a Fibroscan, to detect the progression of his HCV infection fails in light of the Supreme Court's decision in *Estelle v. Gamble* rejecting a very similar argument. In *Estelle*, the plaintiff contended that more should have been done for him by way of diagnosis and treatment, and he suggested a number of options the Texas Department of Corrections did not pursue. *Id*., 429 U.S. at 107. The Fifth Circuit Court of Appeals agreed with the plaintiff, "[c]ertainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." *Gamble v. Estelle*, 516 F.2d 937, 941 (5th Cir. 1975), *rev'd,* 429 U.S. 97 (1976). But the Supreme Court soundly rejected this claim stating, "[b]ut the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, *or like measures*, does not represent cruel and unusual punishment." *Estelle*, 429 U.S.at 107 (emphasis supplied).

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

15

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

A Fibroscan is one diagnostic technique that can be used to evaluate HCV patients for fibrosis. (Dkt. #70 at 5-6, ¶ 11; Dkt. #71 at 5, ¶ 10). In light of *Estelle*'s rejection of an Eighth Amendment violation for not ordering an X-ray or like measures, it follows that Reed's Fibroscan claim fails for the same reason. This is particularly so when DOC monitored HCV inmates using the APRI, a laboratory-tested diagnostic tool that met the accepted standards of care and was well suited for monitoring a large prison population in accordance with accepted treatment protocols. (Dkt. #156-3 at 26).

> f. Defendants are entitled to qualified immunity to the extent their actions were taken pursuant to the DOC HCV protocol

In *Brown v. Mason*, the Ninth Circuit affirmed a district court's order granting qualified immunity because prison officials acted pursuant to official prison policies that were not "patently violative of constitutional principles." *Id.*, 288 F. App'x 391, 392–93 (9th Cir. 2008) (quoting *Dittman v. California,* 191 F.3d 1020, 1027 (9th Cir. 1999) ("[W]hen a public official acts in reliance on a duly enacted statute or ordinance, that official ordinarily is entitled to qualified immunity" unless the ordinance is "patently violative of fundamental constitutional principles.")). Here, the Court has already held that the DOC HCV protocol does not violate clearly established law; consequently, it is clearly not patently violative of constitutional principles. (Dkt. # 90 at 2). Thus, to the extent Reed claims any of the Defendants acted pursuant to the DOC HCV protocol, which is an official prison policy, they are entitled to qualified immunity. In fact, Reed admits that Dr. Kariko's actions were taken pursuant to official policy in his allegation that "[o]n information and belief, [Dr. Kariko's] decision was based on the triage protocol the DOC adopted on May 1, 2015." (Dkt. #96 at 4, ¶ 14.)

> **2. All Defendants are entitled to qualified immunity because Reed cannot show their actions violated a clearly established constitutional right**

"The Supreme Court has repeatedly emphasized that, to determine whether a given right was 'clearly established' at the relevant time, the key question is whether the defendants should

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

16

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

have known that their specific actions were unconstitutional given the specific facts under review." *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016)*.* As stated in *Hamby*, the Ninth Circuit has been repeatedly chastised for conducting the clearly established inquiry at too high a level of generality. *Id.; see e.g., City & Cty. of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1775–76 (2015) ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011))).

"To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that *what he* [or she] *is doing* violates that right." *Taylor,* 135 S. Ct. at 2044 (emphasis added) (quoting *Reichle v. Howards,* 566 U.S. 658 (2012)). Although a plaintiff need not find "a case directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate." *al–Kidd,* 563 U.S. at 741. That is, existing precedent must have "placed beyond debate the unconstitutionality of" the officials' actions, as those actions unfolded in the specific context of the case at hand. *Taylor,* 135 S. Ct. at 2044. Hence, a plaintiff must prove that "precedent on the books" at the time the officials acted "would have made clear to [them] that [their actions] violated the Constitution." *Id.* at 2045.

As explained above, the precedents cited herein demonstrate that each of Reed's claims fail as a matter of law. For this reason, it cannot be said there is *clearly established law* that is so apparent that *every* reasonable official would have understood the actions and omissions alleged against the Defendants here violated a constitutional right *as those actions or omissions unfolded in the specific context of the case at hand*. Therefore, all of the Defendants are entitled to qualified immunity under the second prong of the qualified immunity analysis.

**B.      Reed Failed to Exhaust Administrative Remedies Relating to Claims Involving Defendant Weber, the Fibroscan, the Failure to Monitor in 2016, and the Failure to Conduct a Review of Treatment Priorities After the 2016 Protocol Change**

Before a prisoner may bring a civil rights action under 42 U.S.C. § 1983, he must first exhaust all available administrative remedies. The Prison Litigation Reform Act of 1995

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

17

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1   (PLRA), 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison

2   conditions under section 1983 of this title, or any other federal law, by a prisoner confined in

3   any jail, prison, or other correctional facility until such administrative remedies as are available

4   are exhausted." Exhaustion in cases covered by § 1997e(a) is mandatory. *Booth v. Churner*, 532

5   U.S. 731, 739 (2001). All "available" remedies must be exhausted. *Id.* Claims that are not

6   exhausted under the PLRA must be dismissed, not stayed. *McKinney v. Carey*, 311 F.3d 1198,

7   1199 (9th Cir. 2002). As stated earlier, DOC has a department-wide grievance procedure

8   governed by the OGP. (Dkt. #44 at 2, ¶ 5).

9        In *Jones v. Bock*, 549 U.S. 199, 203 (2007), the Supreme Court examined the grievance

10   process in Michigan and overturned a Sixth Circuit procedural rule permitting suit only against

11   defendants identified in the prisoner's grievance. The *Jones* Court reasoned that exhaustion is

12   not *per se* inadequate under the PLRA when a prisoner later sued an individual the prisoner had

13   not named in the grievance. *Id.* at 219. Rather, the *Jones* Court found that the "applicable

14   procedural rules" a prisoner must properly exhaust, are defined by the prison grievance process

15   itself, not by the PLRA. *Id.* at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

16   Accordingly, the Sixth Circuit's prerequisite was unwarranted under circumstances in which the

17   Michigan grievance process did not specifically require a prisoner to name anyone in the

18   grievance process and the PLRA did not impose such a requirement. *Id.* at 218-219.

19        Unlike the Michigan grievance process, the DOC OGP Manual does require offenders to

20   identify the names of all individuals involved in the incidents described in their grievances. (Dkt.

21   #44 at 4, ¶ 10; Dkt. #44-1 at 21). According to the DOC Grievance Program Manager, Reed did

22   not grieve Weber for staff misconduct or anything else in Grievance Log. Id. 16602604. (Dkt.

23   #44 at 4-5; ¶¶ 14-15). Reed failed to exhaust administrative remedies against Defendant Weber.

24        Furthermore, Reed admits he did not grieve his allegation that Defendants should have

25   monitored his condition with Fibroscan as opposed to APRI scores, his allegation that

26   Defendants should have monitored him sometime in 2016 with APRI scores as called for by the

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

18

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

HCV Protocol, or his allegation that Defendants failed to initiate a review of patient treatment priorities for hepatitis C following a protocol change in October of 2016. (Dkt. #156-3 at 153:2-154:25, 157:2-10). The purpose of the PLRA exhaustion requirement is to give an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Woodford*, 548 U.S. at 89. Reed's failure to grieve these allegations, impermissibly deprived DOC of the opportunity to address them prior to this lawsuit.

**C.     Reed Cannot Establish a Claim of Medical Negligence Against the Defendants**

> **1.     Reed failed to satisfy a condition precedent under Washington law to bringing a medical negligence claim against state employees**

On January 13, 2020, this Court held Defendants' sovereign immunity argument, based on an unambiguous provision in the Washington State Constitution, would only be applied by Washington Courts prospectively, thus allowing Reed's medical negligence claims under Washington law to go forward. (Dkt. #147 at 5-6). Defendants make this argument again here in order to preserve it for appeal. A review of the docket shows Reed failed to comply with certificate of merit provision mandated by Wash. Rev. Code § 7.70.150 (2006).

> **2.     The Defendants against whom Reed alleges medical negligence are entitled to qualified immunity under Washington law**

Washington law recognizes common law qualified immunity for state law enforcement officers when an officer, "'(1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably.'" *Gallegos v. Freeman*, 172 Wash. App. 616, 641–42, 291 P.3d 265, 277–78 (2013) (quoting *McKinney v. City of Tukwila,* 103 Wash. App. 391, 407, 13 P.3d 631 (2000)). While it is an open question whether this doctrine applies to medical providers employed by the State in the specific context of prison medical care, it has been applied to other state employees—including employees who were not law enforcement officers—where, as here, they must make decisions which greatly interfere with people's lives

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

19

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    and they are required to make difficult judgments under extremely difficult circumstances.

2    *Babcock v. State*, 116 Wash. 2d 596, 617–18, 809 P.2d 143, 154 (1991).

3         Here, the conduct attributed to the medical negligence Defendants, Drs. Hammond, and

4    Strick, meets all three of the elements required for the application of qualified immunity. First,

5    their actions were taken pursuant to a statutory duty. Wash. Rev. Code §§ 72.09.040, 72.10.005,

6    72.10.040. Second, the Defendants acted pursuant to DOC Policy 670.000, the Offender Health

7    Plan and the DOC HCV Protocol, which dictated the procedures they implemented, thus

8    satisfying the second element. (Dkt. #109 at 2-3, ¶¶ 5-6; Dkt. #109-1 at 1-48; Dkt. #43 at 2, ¶ 3;

9    Dkt. #43-1 at 1-31). The third element of reasonableness has also been met. Reed alleges

10   Defendants "prescribed or acquiesced in a treatment plan for Reed" that Reed contends was

11   improper. (Dkt. #96 at 12, ¶ 46). Dr. Strick testified at length that the "[p]rioritization of

12   treatment by medical necessity is consistent with the bioethical concepts of distributive justice

13   and medical utility." (Dkt. #43 at 10-13, ¶¶ 18-24). Thus, there is a reasoned basis for applying

14   the DOC HCV Protocol to Reed.

15        Similarly, Reed's claims that Defendants did not monitor Reed's HCV infection at any

16   time in 2016 are subject to qualified immunity. (Dkt. #96 at 12, ¶ 47). Here again, Defendants

17   were (1) carrying out their statutory duty (2) according to policy and (3) acted reasonably. The

18   gap between the December 2015 and the January 2017 APRI scores was only 13 months. (Dkt.

19   #109 at 6, ¶ 16; Dkt. #70 1-2, ¶ 3, at 4, ¶ 9, at 6, ¶12; Dkt. #110 at 3, ¶ 10; Dkt. #111 at 2, ¶ 5).

20   According to Dr. Strick, this gap is not clinically significant compared to the protocol standard

21   of every 12 months. (Dkt. #70 at 6, ¶ 12). Because the gap was not clinically significant, the one

22   month delay in monitoring Reed's condition was reasonable.

23        The same immunity applies to Reed's allegations that "the monitoring that did occur was

24   insufficient because it did not utilize tests and procedures, such as a Fibroscan." (Dkt. 96 at 12,

25   ¶ 47). But Dr. Strick states that the APRI test that was used "is among the best-validated

26   laboratory methods for predicting HCV progression. . . . Because it can be performed with simple

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

20

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

blood tests rather than an invasive procedure, it is well-suited for annual monitoring of patients with HCV." (Dkt. #70 at 4-5, ¶ 10). Therefore, the use of APRI scores for monitoring patients is supported by reason.

Likewise, qualified immunity applies to Reed's claims that Defendants "failed to provide him with treatment even after the DOC's Hepatitis C protocol changed to give the highest treatment priority to patients with a METAVIR score of F2, which Reed had." (Dkt. #96 at 12, ¶ 48). However, Nurse Eschbach testified:

> By late October of 2016, the DOC HCV protocol was revised to recommend treatment with DAAs for all patients with fibrosis scores of ≥ F2. But that does not mean that it was possible for all patients with fibrosis scores at the F2 level to be treated with DAAs at once. The inmate population within DOC generally and specifically at SCCC is not static. Every week new inmates come into the system that must be screened and evaluated for HCV. Some of them already have fibrosis scores at the F3 and F4 levels, which make them a priority over patients like Reed, whose previous biopsy showed only an F2 fibrosis score. At the same time, it was impossible for all F2 patients at SCCC to go through the steps of the DOC HCV protocol in order to begin treatment at once. Patients start on their course of treatment with DAAs, which usually lasts twelve weeks, when they have reached the point in the protocol when they can start taking the medications. At any one time, there can be as many as ten patients taking DAAs at SCCC but there are always additional patients going through the protocol in line behind those currently receiving DAAs. I process HCV patients through as fast as possible given that I also have responsibility for treating other important infectious diseases such as HIV and influenza.

(Dkt. #71 at 4-5, ¶ 8). So here again, it was reasonable that Reed was not immediately provided DAAs after the protocol changed.

Finally, qualified immunity applies to Reed's claims that the medical negligence Defendants "failed to conduct an adequate review of treatment priorities and treatment decisions after the DOC's Hepatitis C protocol changed to give the highest treatment priority to patients with a METAVIR score of F2 or higher." (Dkt. #96 at 12-13, ¶ 49). As Dr. Hammond explains, "HCV is normally very slow to progress so such a massive review as contemplated in the Second Amended Complaint would not have been realistic or medically necessary" so it was reasonable that such a review did not occur. (Dkt. #109 at 6-7, ¶ 17). Accordingly, since all of the actions or omissions attributed to the medical negligence Defendants were reasonable, the third element of the

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

21

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

test for State qualified immunity has been met and the medical negligence Defendants should be granted qualified immunity under Washington State common law.

### 3. Reed's medical negligence claims fail as a matter of law

> As this court held in *Keck,* in the context of medical malpractice, this requires "an expert to say what a reasonable doctor would or would not have done, that the [defendants] failed to act in that manner, and that this failure caused [the] injuries." 184 Wash.2d at 371, 357 P.3d 1080. The expert may not merely allege that the defendants were negligent and must instead establish the applicable standard and how the defendant acted negligently by breaching that standard. *Id.* at 373, 357 P.3d 1080. Furthermore, the expert must link his or her conclusions to a factual basis. *Id.*

*Reyes v. Yakima Health Dist.*, 191 Wash. 2d 79, 86–87, 419 P.3d 819, 823 (2018).

Reed's medical expert is Dr. Robert Gish, M.D. During his deposition, Dr. Gish described "subtle signals of liver dysfunction" in Reed's chemistry and laboratory tests, (Dec. of Barbara, Ex. 1 (Dep. of Gish) at 100:25-101:1), while acknowledging that it would be "[h]ighly variable" as to whether a physician who was not a liver specialist such as himself would recognize the subtle marker. (Dec. of Barbara, Ex. 1 at 101:2-6). More importantly, Dr. Gish had no opinions regarding whether any of the Defendants' provided medical care to Reed that fell below the standard of care. (Dec. of Barbara, Ex. 1 at 102:18-103:18 (Dr. Hammond); 103:22-105:5 (Dr. Strick); 105:6-24 (Weber); 105:25-106:6 (Dr. Smith)). Reed has failed to offer expert testimony to support any claim of medical negligence specific to the Defendants in this case.

Even if the Court denies qualified immunity, Reed's medical negligence claims fail because he cannot establish proximate cause linking any Defendant's care to an injury. To state a viable claim for medical negligence, Reed must prove that an injury resulted from the failure of the health care provider to follow the accepted standard of care. Wash. Rev. Code § 7.70.040. The necessary elements of proof for such claim are: (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances, and (2) such failure was a proximate

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

22

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

cause of the injury complained of. Wash. Rev. Code § 7.70.040. The mere fact that an injury or bad result occurred because of medical treatment is not sufficient to establish that there was negligence or other wrongful conduct *Watson v. Hockett*, 107 Wash. 2d 158, 161, 727 P.2d 669, 672 (1986). "It must, rather, be shown that the doctor's conduct fell below a level that society considers acceptable." *Id.* To establish proximate cause, medical testimony must establish that "the alleged negligence 'more likely than not' caused the later harmful condition leading to injury; that the defendant's actions 'might have,' 'could have,' or 'possibly did' cause the subsequent condition is insufficient." *Shellenbarger v. Brigman*, 101 Wash. App. 339, 348, 3 P.3d 211, 215 (2000).

Here Reed cannot show that the actions or omissions of any of the Defendants caused him any injury. First, there is no injury: recall that Reed's liver, at the time of the Fibroscan, had compensated and he was not showing any symptoms of cirrhosis. (Dkt. #71 at 5, ¶ 10). Nor is there any non-speculative evidence that Reed's disease progression was caused by medical care provided any of the Defendants here. As stated by Dr. Zawitz:

> It is my opinion that it is impossible to know if and when Mr. Reed's liver disease progressed from F2 to F4. Even liver biopsies are error-prone despite being considered the gold standard for staging fibrosis. It is possible Mr. Reed was already cirrhotic in 2014. It is also possible he was F2 and his disease progressed to F4 in the interim timeline until his Fibroscan. One can only say that HCV fibrosis is generally progressive over time and can advance in a nonlinear fashion (very slow to very fast, unpredictably). Mr. Reed's interim APRI scores and clinical encounters were otherwise not suggestive of rapid disease progression based on symptomology, and in my opinion more frequent re-staging of his liver was not indicated.

(Dkt. #156-1 at 28). A jury would be required to impermissibly speculate that Reed was not already cirrhotic in 2014 when he arrived at SCCC. Likewise, a jury would be required to impermissibly speculate that treatment prior to when it was received in 2017 would have led to a different result for Reed. Because Reed cannot show it is more likely than not that Defendants proximately caused his liver to progress to an F4 level, resulting in injury, the Court should summarily dismiss the medical negligence claims against the Defendants in this action.

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

23

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1

## VI.    CONCLUSION

2      The Eighth Amendment, in the context of prisoner medical care, proscribes deliberate

3  indifference to a serious risk of harm to an inmate. Rather than deliberate indifference,

4  Defendants' involvement with Plaintiff demonstrates deliberate monitoring and

5  consideration of Plaintiff's HCV infection and treatment in accordance with DOC policy and

6  protocol, using proven testing methodologies and widely accepted national guidelines.

7  Reed's federal civil rights claims should be dismissed either for want of a constitutional

8  rights violation or lack of clearly established law putting Defendants on notice their acts or

9  omissions constituted such a violation. Reed's state law claim also fails for want of evidence

10  of a breach of the standard of care and of proximate case.

11      Defendants respectfully request the Court summarily dismiss Reed's Second

12  Amended Complaint, in its entirety, with prejudice.

13      RESPECTFULLY SUBMITTED this 9th day of September, 2020.

14
ROBERT W. FERGUSON
Attorney General

15
 s/ Scott M. Barbara

16
SCOTT M. BARBARA, WSBA No. 20885
Assistant Attorney General

17
800 Fifth Avenue, Ste 2000
Seattle, WA 98104

18
Tel:  (206) 389-2033
Fax: (206) 587-4229

19
Email:  scott.barbara@atg.wa.gov
Attorneys for Defendants

20

21

22

23

24

25

26

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

24

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused to be served a copy of the foregoing document on all parties or their counsel of record on the date below as follows:

☐ US Mail Postage Prepaid via Consolidated Mail Service

☒ CM/ECF

        Daniel C. Kelly-Stallings
        Andrew N. Stokes
        Jenna Bruce
        K&L Gates LLP
        925 Fourth Ave. Ste 2900
        Seattle, WA 98104
        Danny.kelly-stallings@klgates.com
        Andrew.stokes@klgates.com
        Jenna.bruce@klgates.com

☒ Email per Agreement

        Danny.kelly-stallings@klgates.com
        Andrew.stokes@klgates.com
        Jenna.bruce@klgates.com

☐ Hand delivered by _____

DATED this 9th day of September, 2020, at Federal Way, Washington.

                 _s/ *Scott M. Barbara*_____
                SCOTT M. BARBARA, WSBA #20885
                Assistant Attorney General
                Attorney for Defendants

DEFS' THIRD MOTION FOR
SUMMARY JUDGMENT
NO. 3:16-CV-05993-BHS-DWC

25

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445