1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

10  CHARLES V REED,

11          Plaintiff,

12     v.

13  WASHINGTON STATE
    DEPARTMENT OF CORRECTIONS
14  et al.,

15          Defendants.

CASE NO. 3:16-CV-05993-BHS-DWC

REPORT AND RECOMMENDATION

NOTED FOR: May 7, 2021

16

17      The District Court referred this action, filed pursuant to 42 U.S.C. § 1983, to United

18  States Magistrate Judge David W. Christel. Presently pending before the Court is Defendants'

19  Third Motion for Summary Judgment (the "Motion"). Dkt. 160.

20      Plaintiff filed this civil rights action in 2016 and alleges Defendants delayed providing

21  medically necessary treatment for his Hepatitis C ("HCV") amounting to deliberate indifference

22  to his medical needs in violation of the Eighth Amendment. *See* Dkt. 96. In the Motion,

23

24

1    Defendants Dr. Sara (Smith) Kariko,[1] Dr. Lara B. Strick, Dr. G. Steven Hammond, and Mr.

2    Robert Weber assert they are entitled to qualified immunity as to both federal and state law

3    claims. Dkt. 160. Defendants are proceeding primarily under the "first prong" of the qualified

4    immunity analysis, arguing there is not a disputed issue of fact as to a constitutional violation,

5    pointing to a lack of personal participation.[2] *See id.* Defendants also argue Plaintiff failed to

6    exhaust several of his claims. *See id.*

7         The undersigned concludes Plaintiff exhausted his claims and therefore recommends

8    denying Defendants' Motion on the issue of exhaustion. However, Plaintiff has failed to

9    sufficiently rebut Defendants' summary judgment showing as to the deliberate indifference

10   claims alleged against Defendants Hammond, (Smith) Kariko, and Strick. Therefore, the

11   undersigned recommends the deliberate indifference claims against Defendants Hammond,

12   Strick, and (Smith) Kariko be dismissed with prejudice, Defendant Weber be dismissed with

13   prejudice as Plaintiff no longer pursues any claims against him, and Plaintiff's state law claims

14   be dismissed without prejudice. The undersigned further recommends granting Defendants'

15   request to strike the newly submitted evidence contained in Plaintiff's Supplemental Response

16   and the undersigned has not considered the new evidence in this Report and Recommendation

17   ("R&R").

18

19

20

21   _____

22        [1] Defendant Smith is now Sarah (Smith) Kariko. *See* Dkt. 99. The Court will refer to her as Defendant
     (Smith) Kariko throughout the Report and Recommendation for consistency with prior orders and reports in this
23   case, as well as consistency with the parties' briefing.
          [2] Defendants' briefly argue the law was not clearly established. *See* Dkt. 160. Plaintiff requested the
24   opportunity to provide supplemental briefing on the second prong of the qualified immunity analysis, whether the
     law was clearly established, if the Court finds it necessary. *See* Dkt. 162.

REPORT AND RECOMMENDATION - 2

1

2                                   FACTUAL BACKGROUND

3      **I.       Procedural History[3]**

4              On September 25, 2017, Defendants moved for summary judgment for the first time on

5      Plaintiff's Eighth Amendment claim for deliberate indifference to a serious medical need. Dkt.

6      40. Defendants argued Plaintiff had failed to establish the violation of a constitutional right and,

7      even if he had established a violation, Defendants were entitled to qualified immunity because

8      the law was not sufficiently clear. *Id.* at 13–24. On January 30, 2018, the undersigned issued a

9      R&R recommending the Honorable Benjamin H. Settle, the District Judge assigned to this case,

10     grant the Motion for Summary Judgment because Plaintiff failed to establish the violation of a

11     constitutional right. Dkt. 57. On April 19, 2018, Judge Settle declined to adopt the R&R. Dkt. 62.

12     Judge Settle concluded Defendants had failed to establish an absence of material questions of

13     fact regarding the violation of Plaintiff's constitutional rights. *Id.* at 4–9. Judge Settle then

14     referred the matter to the undersigned to address Defendants' other bases for summary judgment

15     such as lack of personal participation and whether the law was clearly established. *Id.* at 9–11.

16     Judge Settle also appointed counsel for Plaintiff. *Id.* In appointing counsel, Judge Settle stated:

17                [T]he Court is satisfied that a constitutional violation has occurred if the intentional
                  delay in treating Plaintiff's HCV was prolonged for an extra year because
18                Defendants failed to properly provide an annual evaluation in 2016, as demanded
                  by the [Department of Corrections] DOC's own triage protocol, which would have
19                revealed that Plaintiff's severe liver damage qualified him for treatment.

20     Dkt. 62 at 9-10.

21

22

23     _____

              [3] The following was adapted from Judge Settle's Order Adopting the Report and Recommendation which
24     outlined the procedural history of this case. *See* Dkt. 147 at 6-8.

1    On August 9, 2018, the undersigned issued a second R&R recommending Judge Settle

2    grant Defendants' Motion for Summary Judgment on the issue of qualified immunity. Dkt. 87.

3    On November 11, 2019, Judge Settle adopted the R&R in part and declined to adopt it in part.

4    Dkt. 90. First, Judge Settle agreed with the conclusion there was no clearly established law on

5    the issue of whether the DOC's HCV policy was unconstitutional on its face. *Id.* at 2. Judge

6    Settle concluded the key distinction was the policy included exceptions to the categorical denial

7    of treatment and the exceptions were based on an individual's objective symptoms. *Id.*

8    Regarding Plaintiff's objective symptoms, Judge Settle found the R&R did not accurately reflect

9    the record. *Id.* at 3–6. Judge Settle concluded Plaintiff should be given an opportunity to discover

10   evidence to counter Defendants' medical expert evidence and it was possible questions of fact

11   could exist whether Defendants were negligent or deliberately indifferent. *Id.* Thus, Judge Settle

12   declined to adopt the R&R on all other issues and referred the matter for further consideration of

13   Plaintiff's Motion to Amend the Complaint and reopen discovery. *Id.* at 7.

14   With respect to Plaintiff's objective symptoms, Judge Settle held: "[T]here appears to be

15   a question of fact whether Defendants knew of Reed's worsening symptoms and denied

16   treatment despite this knowledge." Dkt. 90 at 5. Judge Settle cited to evidence submitted by

17   Defendants, declaration of Defendant Strick. Dkt. 90 at 5 (citing Dkt. 70). In her declaration,

18   Defendant Strick addresses Plaintiff's alleged symptoms and concludes each symptom either

19   does not relate to HCV or is a non-specific symptom which could be associated with many other

20   conditions. Dkt. 70, Strick Declaration, at 3-4. Plaintiff countered he required additional

21   discovery to counter Defendant Strick's expert opinion and conclusions. Dkt. 78 at 11–15.

22   Further, Judge Settle found:

23   Finally, Defendants assert that at most Reed has submitted evidence to create a
     dispute between him and Dr. Strick as to medical opinion testimony. Dkt. 89 at 4–

24

1      5. Defendants argue that this is an insufficient factual showing to overcome
2 summary judgment. *Id.* at 4 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.
1989)). The Court agrees with Defendants that if this ultimately boils down to a
3 difference of medical opinion, then Reed has failed to meet his burden. The Court,
however, recognizes that some evidence suggests that Defendants ignored Reed's
4 extrahepatic symptoms and proceeded with the general HCV protocol. *See, e.g.*,
Dkt. 8 at 11 ("The standard DOC protocol for management of hepatitis C has been
5 followed in your case and treatment has been withheld at this point because the
degree of your liver disease does not make treatment medically necessary at this
6 time."). The Court also notes that the Care Review Committee rejected Reed's
request for treatment by concluding in part that Reed is fortunate that his infection
7 has not caused more harm to his body considering the length of the infection and,
at this point, it is more likely that he would die of other causes. Dkt. 42-1 at 67
8 ("The patient should be reassured that he only has F2 fibrosis after ~35 years of the
disease. Given he is 61 [years old], there is a high likelihood he will die of an
9 alternative process."). A reasonable juror could possibly conclude that such an
explicit statement establishes deliberate indifference to Reed's serious medical
10 needs if legitimate extrahepatic symptoms were presented to the committee and
subsequently ignored.

11 Dkt. 90 at 6.

12      On January 14, 2019, the undersigned entered an Order granting the Motion for Leave to

13 Amend (Dkt. 74) and the Motion for Limited Discovery (Dkt. 75) and entered a R&R

14 recommending the Motion for Summary Judgment (Dkt. 40) be denied as moot.  Dkt. 94, 95. On

15 January 25, 2019, Plaintiff filed an Amended Complaint. Dkt. 96. Plaintiff asserts one claim for

16 violation of his Eighth Amendment rights and one claim for medical malpractice under

17 Washington law. *Id.* ¶¶ 32–50.  On February 14, 2019, Judge Settle adopted the undersigned's

18 R&R recommending Defendants' original Motion for Summary Judgment (Dkt. 40) be denied as

19 moot in light of the Amended Complaint. Dkt. 101. On February 22, 2019, the undersigned

20 issued a scheduling order setting August 22, 2019 as the deadline for completion of discovery.

21      On March 20, 2019, Defendants filed another Motion for Summary Judgment on

22 qualified immunity while discovery was still pending. Dkt. 108. On April 9, 2019, Defendants

23 filed a Motion for a Protective Order requesting all discovery be stayed pending determination of

24

their Motion for Summary Judgment. Dkt. 113. In other words, Defendants sought a

determination there are no disputes of material fact and an order precluding Plaintiff from

propounding discovery to gather relevant facts. On May 8, 2019, the undersigned denied both the

Motion for Summary Judgment (Dkt. 108) and the Motion for Protective Order (Dkt. 113)

without prejudice. Dkt. 120. On May 22, 2019, Defendants filed objections. Dkt. 121. On June

18, 2019, Judge Settle denied Defendants' objections agreeing with the undersigned that

Defendants' Motion for Summary Judgment was premature. Dkt. 127. Judge Settle stated

nothing precluded Defendants from filing a motion for judgment on the pleadings based on

qualified immunity. *Id.* at 2–3.

On July 9, 2019, Defendants filed a Motion for Judgment on the Pleadings. Dkt. 132. On

August 29, 2019, the undersigned issued an R&R recommending in part that Judge Settle deny

the Motion for Judgment on the Pleadings because additional discovery is necessary and

"qualified immunity cannot be resolved on the pleadings in this case . . . ." Dkt. 137 at 6–9. On

September 12, 2019, Defendants filed objections. Dkt. 138. Judge Settle adopted the R&R on

Defendants' Motion for Judgment on the Pleadings, dismissing the state law certificate of merit

issue and finding that as to qualified immunity, Defendants' Motion for Judgment on the

Pleadings improperly requests relief as to individual allegations within Plaintiff's Eighth

Amendment claim. Dkt. 147 at 9-10.

In September 2020, Defendants filed the Motion. Dkt. 160. The undersigned deferred

ruling on the Motion until the issue of consolidation with 20-5580-BHS-DWC was resolved.

Dkt. 166, 168. The undersigned heard Oral Argument on January 14, 2021. *See* Dkt. 172. On

January 26, 2021, the undersigned entered an Order Directing Supplemental Briefing in which

the Court re-noted Defendants' Motion for March 12, 2021 and limited briefing to specific

1    questions identified by the Court. Dkt. 173. The parties subsequently filed their supplemental

2    briefs. Dkt. 175, 176, 178.

3                           **SUPPLEMENTAL REPLY/MOTION TO STRIKE**

4          In the Supplemental Reply, Defendants argue Plaintiff's supplemental briefing and

5    submissions provided numerous documents which were not previously part of the record and

6    object to the submission of this new evidence.  Dkt. 178. Defendants move to strike the

7    following evidence submitted with Plaintiff's Supplemental Response and citations in the

8    briefing thereto:

9        A.  Exhibit E, Complete Deposition of Dr. Chad Zawitz, (Dkt. #177-5 at 1-79);
             Plaintiff's Supplemental Brief, (Dkt. #176 at 11, ll. 2-4, 16-17, 26, at 12, ll. 1-
10            3);
         B.  Exhibit F, January 7, 2016 email, (Dkt. #177-6 at 1-2); Plaintiff's Supplemental
11            Brief, (Dkt. #176, at 13, ll. lines 5-6, at 6, line 26, at 7, ll. 1-2, at 13, ll. 5-6);
         C.  Exhibit G, Care Review Committee Roster, (Dkt. #177-7 at 1-4); Plaintiff's
12            Supplemental Brief, (Dkt. #176 at 6, line 26, at 7, ll. 1-2, at 13, ll. 5-6);
         D.  Exhibit H, January 13, 2016 email, (Dkt. #177-8 at 1-2); Plaintiff's
13            Supplemental Brief, (Dkt. #176 at 6, line 26, at 7, ll. 1-2, at 13, ll. 5-6);
         E.  Exhibit I, Care Review Committee Roster, (Dkt. #177-9 at 1-4); Plaintiff's
14            Supplemental Brief, (Dkt. #176 at 6, line 26, at 7, ll. 1-2, at 13, ll. 3-6, 7-13);
         F.  Exhibit J, [Smith] Kariko discovery responses, (Dkt. #177-10 at 1-17);
15            Plaintiff's Supplemental Brief, (Dkt. #176 at 13, ll. 19-24);
         G.  Exhibit K, February 24, 2016 email, (Dkt. #177-11 at 1-5); Plaintiff's
16            Supplemental Briefing, (Dkt. #176 at 8, ll. 7-12, at 14, ll. 17-23);
         H.  Exhibit L, October 19, 2017 email, (Dkt. #177-12 at 1-2); Plaintiff's
17            Supplemental Brief, (Dkt. #176 at 8, ll. 12-15, at 14, ll. 23-26);
         I.  Exhibit N, February 23, 2016 email, (Dkt. #177-14 at 1-2); Plaintiff's
18            Supplemental Brief, (Dkt. #176 at 13, line 26, at 14, line 1); and
         J.  Exhibit O, Presentation, (Dkt. #177-15 at 1-50); Plaintiff's Supplemental Brief,
19            Dkt. #176 at 9, ll. 11-20).[4]

20
     Dkt. 178 at 2-3; *See also* Local Civil Rule 7(g) ("Requests to strike material contained in or
21
     attached to submissions of opposing parties shall not be presented in a separate motion to strike,
22

23   _____

         [4] Defendants do not dispute the submission of Exhibits A, B, C, D, *see* Dkt. 177, 178. Thus, the Court will
24   consider Exhibits A, B, C, and D (Dkt. 177) in this Report and Recommendation.

1    but shall instead be included in the responsive brief, and will be considered with the underlying

2    motion.").

3          Defendants argue the undersigned specifically instructed the parties to search through the

4    existing record for evidence regarding each question on supplemental briefing, and the

5    undersigned told the parties it was not seeking additional evidence not already submitted. Dkt.

6    178 at 1-2. Defendants argue they did not submit any new evidence in support of their

7    supplemental briefing and cited only to evidence already of record in this case. *Id.* Defendants

8    contend allowing Plaintiff to file additional evidence at this stage is unfair and should not be

9    permitted, at it leaves them without an opportunity to respond to new evidence. *Id.* (citing

10   Federal Rules of Civil Procedure 1, 6(b), and 56(d)).

11         The broad purpose of the Federal Rules of Civil Procedure is to "secure the just, speedy,

12   and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Federal Rule

13   of Civil Procedure 16 is the central pretrial rule which authorizes courts to manage their cases

14   "so that disposition is expedited, wasteful pretrial activities are discouraged, the quality of the

15   trial is improved, and settlement is facilitated." *In re Phenylpropanolamine Prods. Liab. Litig.*,

16   460 F.3d 1217, 1227 (9th Cir. 2006) (citing Fed. R. Civ. P. 16). "Orderly and expeditious

17   resolution of disputes" is of utmost importance in the rule of law. *Phenylpropanolamine*, 460

18   F.3d at 1227. "[D]elay in reaching the merits, whether by way of settlement or adjudication, is

19   costly in money, memory, manageability, and confidence in the process." *Id.* "A defendant

20   suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to

21   interfere with the rightful decision of the case." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406,

22   1413 (9th Cir. 1990).

23         Here, Plaintiff did not move to modify the scheduling order or seek permission to delay his

24   original or Supplemental Response by way of a Federal Rule of Civil Procedure 56(d)

continuance. Dkt. 176, 177. The newly submitted evidence was not previously submitted in opposition to Defendants' Motion. *See* Dkt. The undersigned's Order Directing Supplemental Briefing states in relevant part, "[a]ll briefing should include a thorough citation to relevant law and evidence *in the record.*" Dkt. 173 (emphasis added). The undersigned's Order did not permit the parties to bring new evidence, not previously cited in the record, before the Court. *See id.*

Moreover, at the time Plaintiff filed his original Response to Defendants' Motion, he was on notice of the matters of material dispute and at that point Plaintiff had fair opportunity to introduce any evidence he considered relevant in opposition to Defendants' Motion. The undersigned's direction for supplemental briefing was not an invitation for Plaintiff to have a second opportunity to bring new evidence to the Court's attention which could and should have been brought in the original briefing and submissions. To permit plaintiff to introduce additional evidence at this time would be prejudicial to Defendants as well as contradictory to the underlying principles of Federal Rules of Civil Procedure. *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1413 (9th Cir. 1990); Fed. R. Civ. P. 1 and 16. Thus, to avoid significant prejudice to Defendants and to achieve the orderly and expeditious resolution of disputes, the undersigned recommends granting Defendants' Motion to Strike. The undersigned will not consider any new evidence filed in support of the Plaintiff's Supplemental Response or citations to the new evidence therein as identified below:

A.  Exhibit E, Complete Deposition of Dr. Chad Zawitz, (Dkt. #177-5 at 1-79);
B.  Exhibit F, January 7, 2016 email, (Dkt. #177-6 at 1-2);
C.  Exhibit G, Care Review Committee Roster, (Dkt. #177-7 at 1-4);
D.  Exhibit H, January 13, 2016 email, (Dkt. #177-8 at 1-2);
E.  Exhibit I, Care Review Committee Roster, (Dkt. #177-9 at 1-4);
F.  Exhibit J, [Smith] Kariko discovery responses, (Dkt. #177-10 at 1-17);
G.  Exhibit K, February 24, 2016 email, (Dkt. #177-11 at 1-5);
H.  Exhibit L, October 19, 2017 email, (Dkt. #177-12 at 1-2);
I.  Exhibit N, February 23, 2016 email, (Dkt. #177-14 at 1-2); and
J.  Exhibit O, Presentation, (Dkt. #177-15 at 1-50).

1

**DEFENDANT WEBER**

2

In the Supplemental Response, Plaintiff states he is no longer pursuing a claim against

3

Defendant Weber, and Defendants indicated they have no objection to this. Dkt. 176, 178.

4

Therefore, the undersigned recommends dismissing Defendant Weber with prejudice.

5

**STANDARD OF REVIEW**

6

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "the court shall grant summary

7

judgment if the movant shows that there is no genuine dispute as to any material fact and the

8

movant is entitled to judgment as a matter of law." A party asserting a fact cannot be or is

9

genuinely disputed must support the assertion by:

10
11

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

12
13

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

14

Fed. R. Civ. P. 56(c)(1). All facts and reasonable inferences drawn therefrom must be viewed in

15

the light most favorable to the nonmoving party. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th

16

Cir. 2013) (*citing Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011); *Tarin v. County*

17

*of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).

18

The party moving for summary judgment has the initial burden to demonstrate no genuine

19

issue of material fact remains in this case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *In re*

20

*Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). The movant "always bears

21

the initial responsibility of informing the district court of the basis for its motion," and identifying

22

those portions of the record, including pleadings, discovery materials, and affidavits, "which it

23

believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

24

Mere disagreement or the bald assertion stating a genuine issue of material fact exists does not

1   preclude summary judgment. *California Architectural Building Products, Inc. v. Franciscan*

2   *Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to

3   an element of a claim or defense and whose existence might affect the outcome of the suit," and

4   the materiality of which is "determined by the substantive law governing the claim." *T.W.*

5   *Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

6           Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant

7   of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some 'significant

8   probative evidence tending to support the complaint.'" *Id.* (quoting *Anderson*, 477 U.S. at 290); *see*

9   *also California Architectural Building Products, Inc.*, 818 F.2d at 1468 ("No longer can it be

10  argued that any disagreement about a material issue of fact precludes the use of summary

11  judgment."). In other words, the purpose of summary judgment "is not to replace conclusory

12  allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v.*

13  *National Wildlife Federation*, 497 U.S. 871, 888 (1990). "If a party fails to properly support an

14  assertion of fact or fails to properly address another party's assertion of fact as required by Rule

15  56(c), the court may . . . grant summary judgment if the motion and supporting materials--

16  including the facts considered undisputed--show that the movant is entitled to it[.]" Fed. R. Civ. P.

17  56(e)(3).

18                           **DEFENDANTS' MOTION (DKT. 160)**

19          Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs

20  when they denied him access to adequate medical treatment for his HCV. Dkt. 96. In the Motion,

21  Defendants contend they are entitled to qualified immunity with respect to Plaintiff's federal and

22  state law claims, and Plaintiff failed to exhaust his administrative remedies as to several of his

23  federal claims. *See* Dkt. 160. Defendants also argue Plaintiff has failed to allege Defendants

24  actions amount to personal participation in the alleged constitutional violations. *See id.*

A.  **Evidence**[5]

HCV is a viral infection which can slowly damage the liver over time. Dkt. 43, Strick Decl., at 4. After the initial infection, HCV can cause progressive "fibrosis" or scarring of the liver; the most advanced stage being "cirrhosis." *Id*. Serious clinical consequences of HCV, such as symptoms of liver dysfunction, overt liver failure, liver cancer, and death can occur in patients with cirrhosis. *Id*. The progression to cirrhosis is a variable process, with 20-30% of people with HCV progressing to cirrhosis over a 20-year period. Dkt. 43, Strick Decl., at 4-5. Some persons, despite HCV, never develop any scarring of the liver. *Id*.

In HCV patients, a liver biopsy, a procedure using a needle to obtain several small pieces of liver for microscopic examination, is the "gold standard" for assessing the degree of fibrosis. *Id*. Liver fibrosis is graded on a scale from F0 to F4 on a METAVIR fibrosis level (hereinafter "fibrosis"): "F0" means no scarring; "F1" means mild scarring; "F2" means moderate scarring; "F3" means severe scarring; and "F4" means very severe scarring/cirrhosis. Dkt. 43, Strick Decl., at 5-6, Table 1.

---

[5] The following is taken largely from Defendants' Motion as the majority of the factual basis for Plaintiff's medical history is not disputed among the parties. *See* Dkt. 160, 162. In support of their Motion, Defendants refer to the following evidence: (1) Declaration of Defendant Hammond and attached exhibits (Dkt. 109); (2) Declaration of Defendant (Smith) Kariko (Dkt. 110); (3) Declaration of Weber (Dkt. 111); (4) Declaration of Elizabeth Eschbach and attached exhibits (Dkt. 71); (5) Declarations of Lara Strick, M.D. and attached exhibits (Dkt. 43, 43-1, 70); (6) Declaration of Dr. Chad Zawitz, M.D. (Dkt. 156); (7) copy of excerpts from Plaintiff's deposition (Dkt. 156); and (8) copy of excerpts from Dr. Robert Gish's deposition (Dkt. 162). Plaintiff previously submitted Declarations of Ryan Herrington, Defendant Strick, Dale Caldwell, Andrea Slemp, Elizabeth Eschbach, and Kevin Bovenkamp. *See* Dkts. 42-45, 55-56, 69-71.

Plaintiff submitted the following evidence in his Response (Dkt. 164; Dkt. 164-1): (1) transcript of the deposition of Defendant Hammond (Dkt. 164); (2) transcript of the deposition of Defendant Strick (Dkt. 164); (3) transcript of the deposition of non-party Elizabeth Eschbach (Dkt. 164); (4) transcript of the deposition of Defendant (Smith) Kariko (Dkt. 164) (5) transcript of the deposition of Dr. Gish (Dkt. 164); (6) copy of the expert report of Cloie Johnson (Dkt. 164); (7) copies of Plaintiff's 2016 grievances (Dkt. 164); (8) declaration of Plaintiff (Dkt. 163); and (9) declaration of Dr. Gish (Dkt. 165). Plaintiff also previously submitted another declaration (Dkt. 51, 78 and attached exhibits).

1      The DOC Offender Health Plan ("OHP") defines the level and scope of medical care

2  provided to individuals in DOC custody. Dkt. 109 at 2-3; Dkt. 109-1. The OHP defines three

3  Levels of Care: Level 1 – medically necessary; Level 2 – medically necessary in some instances

4  and must be reviewed and approved by a Care Review Committee (CRC); and Level 3 – not

5  medically necessary and not authorized. *Id*. The OHP lists HCV as subject to Level 1 treated

6  "under DOC [HCV] protocol." Dkt. 109 at 3; Dkt. 109-1 at 21. DOC Policy 670.000,

7  Communicable Disease, Infection Prevention, and Immunization and the DOC HCV protocol are

8  documents that guide decision-making for HCV within DOC. Dkt. 43, Strick Decl., at 2; Dkt.

9  43-1 at 2-9; Dkt. 43-1 at 11-31.

10      Plaintiff was diagnosed with HCV in 2012 while he was incarcerated at Airway Heights

11  Correctional Center. Dkt. 163, Reed Declaration, at 7. Prior to Plaintiff's arrival at Stafford

12  Creek Correctional Center ("SCCC") in August 2014, he had a liver biopsy on June 10, 2014.

13  Dkt. 96 at 3; Dkt. 71 at 2. The liver biopsy showed Plaintiff's fibrosis score was an F2. *Id.*[6]

14      After being transferred to SCCC in August 2014, Plaintiff began seeking treatment for his

15  HCV. *Id.* at 13. On June 5, 2015, Ms. Elizabeth Eschbach (a non-party nurse) evaluated Plaintiff

16  for HCV treatment. Dkt. 71; Dkt. 163, Reed Decl., at 13-14.[7] Ms. Eschbach also monitored

17  Plaintiff in accordance with the HCV protocol. Dkt. 71 at 3. The HCV protocol calls for, in part,

18  annual blood tests designed to predict the fibrosis level of patients without the need for an

19  invasive liver biopsy. *Id.* at 2-3. These blood tests are used to calculate an AST to Platelet Ratio

20  _____

21      [6] Plaintiff disputes whether the assessment at stage F2 was correct.  Dkt. 165, Gish Decl., at 20-21; Dkt. 96,
   at 3, ¶ 11. However, Plaintiff does not set forth any of the named Defendants participated in this assessment or

22  biopsy. *See id.* Thus, the Court does not find this is a disputed issue of material fact.
      [7] Plaintiff disputes whether Ms. Eschbach properly assessed whether Plaintiff had extrahepatic symptoms

23  warranting treatment. *See id.*  However, Ms. Eschbach is not a named Defendant in this matter, so this dispute is not
   related to a material fact at issue in this case. To the extent Plaintiff alleges the named Defendants knew or should

24  have known of his extrahepatic symptoms, the Court addresses this argument with respect to Defendants Hammond,
   Strick, and (Smith) Kariko, below.

1  Index ("APRI") score, which provides a non-invasive way to predict fibrosis and cirrhosis in

2  HCV patients without imaging or biopsy. *Id.* at 2-3.

3         Ms. Eschbach testified because Plaintiff's APRI scores were relatively low compared to

4  others with higher levels of fibrosis, nothing in her evaluations indicated his disease had

5  progressed to an F3 or F4 score and his symptoms were inconsistent with the HCV extrahepatic

6  manifestations. Dkt. 71 at 3. During a chronic HCV infection, "extrahepatic manifestations," are

7  physical symptoms of HCV which occur in some patients Dkt. 71 at 2. Thus, Ms. Eschbach did

8  not see an indication for immediate treatment with Direct Acting Anti-virals ("DAAs"). *Id.* at 3.[8]

9  Ms. Eschbach testified Plaintiff's complaints of arthritis, Barrett's esophagus, and migraine

10  headaches were not symptoms normally associated with HCV. Dkt. 71 at 4. Nevertheless, on

11  Plaintiff's request, Ms. Eschbach reported Plaintiff's case to the HCV CRC. *Id.* at 4.

12         On October 1, 2015, Defendant (Smith) Kariko evaluated Plaintiff and also referred his

13  case to the HCV CRC. Dkt. 163, Reed Decl., at 14. Defendant (Smith) Kariko noted the

14  following symptoms: "Fatigue, Visual Changes, Cough, Shortness of Breath, Palpitations,

15  Hemorrhoids with Bright Red Blood Per Rectum, Constipation, Nausea, Muscle/Joints Aches,

16  Easy Bruising, and Anxiety." Dkt. 42-1 at 63; Dkt. 163, Reed Decl., at 14. Defendant (Smith)

17  Kariko also reported Plaintiff had Barrett's esophagus and recommended an endoscopic

18  surveillance every three to five years. Dkt. 42-1 at 63-64. She further recommended an

19  optometry consult and neurology evaluation for headaches. Dkt. 42-1 at 63-64. In December

20  2015, Plaintiff received APRI testing. Dkt. 70, Strick Decl., at 5-6; Dkt. 71 at 3.

21         In order to apply the HCV protocol, a specific HCV CRC (hereinafter "CRC") was

22  created. Dkt. 109 at 3. The CRC is composed of practitioners presenting or discussing care of

23

24         [8] The fibrosis score was left blank on the HCV Treatment Eligibility Evaluation Form. Dkt. 51-1 at 46-51.

patients with HCV. *Id*. Defendants Hammond and Strick are voting CRC members. *Id.*   At CRC

meetings, the patient's provider summarizes the patient's history, diagnosis, exam findings,

symptoms, and other information relevant to the use of DAAs per the HCV protocol. Dkt. 109 at

3. The CRC then discusses each case presented and determines by a majority vote whether to

defer or prioritize treatment with DAAs. *Id.*

On January 7, 2016, the CRC determined treatment was not warranted because Plaintiff

was assessed with an F2 fibrosis score, his APRI was relatively low and had not significantly

changed over the time period since his most recent biopsy. Dkt. 42-1 at 67. The CRC found the

risks of a repeat liver biopsy outweighed the benefits, since it was unlikely to be significantly

different form the last one. *Id.* The CRC concluded Plaintiff did not meet the DOC Criteria for

HCV treatment given his low-moderate fibrosis and no co-morbidity putting him in a high risk

category. *Id.* The CRC recommended Plaintiff be monitored every year and he be reassessed for

treatment eligibility "per the HCV protocol." *Id.* When initial treatment decisions were made in

Plaintiff's case, treatment with DAAs was deferred for patients with lower levels of fibrosis,

prioritizing treatment with DAAs for patients with more severe fibrosis. Dkt. 109 at 3.

In October 2016, the DOC's HCV protocol changed. Dkt. 163, Reed Decl., at 23. Under

the new protocol, patients with a fibrosis score of F2 or higher were to be given the highest

treatment priority for DAAs. Dkt. 71 at 4-5. However, according to Ms. Eschbach, it was not

possible for all patients with F2 scores to be treated with DAAs at once. Dkt. 71 at 4. In addition,

because the population with the SCCC is consistently changing, e.g. new inmates come into the

system which must be screened and evaluated for HCV, some already have F3 or F4 scores

which make them a priority. Dkt. 71 at 4. Under this new protocol, Plaintiff was eligible for  the

highest treatment priority based on his previously established fibrosis score of F2. *Id.* After the

1    change in protocol to include patients with F2 fibrosis scores, the DOC developed a system to

2    prioritize treatment with DAAs within that population based on APRI scores. Dkt. 71 at 5.

3        In January 2017, Plaintiff received another APRI test. Dkt. 70, Strick Decl., at 5-6; Dkt.

4    71 at 3. Plaintiff was evaluated by Ms. Eschbach in April 2017 after other patients with F2

5    fibrosis scores with APRI scores indicating more advanced scarring. Dkt. 71 at 5. On June 20,

6    2017, Plaintiff received a Fibroscan, a less invasive diagnostic technique than a liver biopsy used

7    to evaluate HCV patients for fibrosis. Dkt. 70, Strick Decl., at 5-6; Dkt. 71 at 5. The Fibroscan

8    showed his HCV infection may have progressed to the equivalent of an F4, making him a high

9    priority for treatment. Dkt. 71 at 5. In October 2017, the CRC approved Plaintiff for treatment

10   with DAAs which Plaintiff received in November 2017. Dkt. 71-1 at 5-6; Dkt. 163, Reed Decl.,

11   at 23.

12   **B. Exhaustion**

13       Defendants argue Plaintiff failed to exhaust his administrative remedies as to the

14   following claims: (1) use of a Fibroscan to monitor his condition; (2) failure to monitor his

15   condition in 2016; and (3) failure to initiate a review of HCV treatment priorities following the

16   protocol change in October 2016 (hereinafter "use of Fibroscan, failure to monitor, and failure to

17   review treatment priorities"). Dkt. 160 at 7, 17-18.  Plaintiff argues none of the issues related to

18   use of a Fibroscan, monitoring, or a review of treatment priorities, were apparent at the time

19   Plaintiff filed his Grievance 16602604 (defined *infra*). Dkt. 162 at 19. Plaintiff argues these are

20   not standalone claims, but rather, "pieces of evidence he will use to support his Eighth

21   Amendment and medical negligence claims." *Id.*

22

23

24

1          i.    *Evidence*

2          The Washington Offender Grievance Program ("OGP") allows inmates to file grievances

3  on a wide range of issues related to their incarceration. Dkt. 44 at 1, ¶ 3, at 2, ¶ 5. Each facility

4  manages its grievance program in accordance with DOC 550.100, OGP, and the OGP Manual,

5  Dkt. 44 at 1, ¶ 3; Dkt. 44-1, at 2-5, 8-40, copies of which are available to inmates for review in

6  the library or law library. Dkt. 44 at 2, ¶ 4. Since March 2005, offenders have 20 working days

7  from the date of an incident to file a grievance. Dkt. 44 at 3-4, ¶ 9. The OGP Manual requires

8  offenders to identify the names of all individuals involved in the incidents described in their

9  grievances and make a simple, straightforward statement about what happened and what they are

10  grieving. Dkt. 44-1 at 21.

11          Plaintiff listed Grievance Log Id. 16602604 (hereinafter "Grievance 16602604") as the

12  grievance resolution for any grievances concerning facts relating to this case in Appendix 2 to

13  his Amended Complaint. *See* Dkt. 8; Dkt. 51 at 76-80 (Attachment 5); Dkt. 163, Reed Decl., at

14  18. On January 21, 2016, Plaintiff appealed the CRC's treatment decision and filed a Level I

15  grievance against Defendant (Smith) Kariko, the members of the CRC, the Director of Health

16  Services, and the DOC arguing he should receive treatment for HCV. Dkt. 163, Reed Decl., at

17  18-19. In Grievance 16602604, Plaintiff states:

18          I want to grieve Dr. Smith [Kariko], members of the [CRC], the Director of Health
           Services and the [DOC] because I am being denied treatment to a known medical
19          condition classified as a Level 1 "necessary" (Hepatitis C) infectious
           disease….This disease is contagious and can potentially turn into cancer causing
20          further injury to my liver of which DOC and its agents may be liable. When I
           accepted and was treated for Hepatitis B, the condition required continuing
21          treatments to include treatment for Hepatitis C.

22  Dkt. 51 at 76 (Attachment 5).

23

24

1    The grievance was disapproved, and Plaintiff appealed to Level II. *Id.* at 77. In the Level

2    II grievance, Plaintiff named Defendants Hammond, Strick, (Smith) Kariko and members of the

3    CRC. *Id.* The Level II appeal states:

4    > [The CRC members] that voted to deny proposed care on 1-7-16, exposing me to
     > substantial risk of serious harm leading to arbitrary, unsound & counter-therapeutic
5    > clinical decisions....With[out] treatment, the disease will inevitably result in further
     > injury & potentially turn into cancer. I'm suffering 80% loss of energy & have
6    > excruciating pain from increasing headaches, fatigue, dizziness, forgetfulness
     > affecting my ability to concentrate & my behavior has dramatically changed, with
7    > having unexplained episodes of violence. The symptoms are evidence in my
     > medical file & are listed as warning signs in the HCV Support Project.

8    Dkt. 51 at 77. This grievance was also disapproved. *Id.*

9    In Plaintiff's appeal to Level III, he states in relevant part:

10

11   > [T]he named employees and contract staff over whom the facility or supervising
     > office has jurisdiction are deliberately denying me available treatment to an
     > infectious disease known as Hepatitis Type C. The continuance of monitoring the
12   > disease, doesn't cure the disease, the unnecessary delay in treatment will ultimately
     > result in acceleration to a Level III or Level IV liver disease causing long-term liver
13   > damage, increasingly progressing to fibrosis, cirrhosis, or hepatocellular carcinoma
     > (liver cancer) of which the physicians will be liable because they failed to take
14   > action to a known medical condition.

15   Dkt. 51 at 78. Plaintiff's final Level III appeal was denied. *Id.*

16       ii.    *Law and Analysis*

17       Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

18   respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner

19   confined in any jail, prison, or other correctional facility until such administrative remedies as

20   are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Porter v. Nussle*,

21   534 U.S. 516, 524 (2002). The requirement's underlying premise is to "reduce the quantity and

22   improve the quality of prisoner suits" by affording prison officials the "time and opportunity to

23   address complaints internally before allowing the initiation of a federal case. In some instances,

24

REPORT AND RECOMMENDATION - 18

1  corrective action taken in response to an inmate's grievance might improve prison administration

2  and satisfy the inmate, thereby obviating the need for litigation." *Id.* at 524–25.

3       The PLRA requires "proper exhaustion" of an inmate's claims. *Woodford v. Ngo*, 548

4  U.S. 81, 90 (2006). Proper exhaustion means an inmate must "use all steps the prison holds out,

5  enabling the prison to reach the merits of the issue." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th

6  Cir. 2009) (citing *Woodford*, 548 U.S. at 90). Thus, exhaustion "demands compliance with an

7  agency's deadlines and other critical procedural rules because no adjudication system can

8  function effectively without imposing some orderly structure on the course of its proceedings."

9  *Woodford*, 548 U.S. at 90–91. Failure to exhaust is an affirmative defense. *Jones v. Bock*, 549

10  U.S. 199, 216 (2007). The defendant bears the burden of proving that an available administrative

11  remedy was unexhausted by the inmate. *Albino*, 747 F.3d at 1172.

12       Plaintiff does not dispute he did not separately grieve his complaints as to the use of a

13  Fibroscan, failure to monitor, or failure to review treatment priorities. Dkt. 162, 176. However,

14  Plaintiff alleges these claims are not standalone claims but rather factual allegations which

15  support his Eighth Amendment claim. *See id.* Defendants exhaustion argument rests primarily

16  upon their assertion that Plaintiff's inadequate medical treatment claim contains not one claim,

17  but rather several distinct claims, which Plaintiff did not separately exhaust. Dkt. 160, 175.

18       A district court in California addressed a similar argument related to the divisibility of an

19  inadequate medical treatment claim. In *Gomez v. Winslow,* 177 F.Supp.2d 977, 978–82 (N.D.

20  Cal. 2001), the plaintiff filed an administrative appeal alleging "[i]nadequate medical attention to

21  a serious medical need" and explained that he had not received treatment for his HCV despite his

22  "numerous requests to the medical staff." *Id.* at 979. In his subsequent lawsuit, the plaintiff

23  asserted an Eighth Amendment claim of deliberate indifference to his serious medical needs. *Id.*

24

He alleged the prison medical staff had failed to inform him of his HCV diagnosis for years,
delayed his treatment, and failed to respond to his requests for information. *Id.* at 980. Though
the *Gomez* plaintiff only detailed one of these claims in his administrative appeal, the district
court rejected the defendants' exhaustion argument and concluded the other allegations were
"simply aspects" of the inadequate-medical-treatment problem, because "all of the elements of
[the plaintiff's] claim relate to his dissatisfaction with the treatment he received for his hepatitis."
*Id.* at 983. *See also Barrett v. Cate,* 2011 WL 6753993, at *5 (E.D. Cal. Dec. 23, 2011).

Although *Gomez* is not binding on this Court, it is persuasive. Similar to the plaintiff in
*Gomez,* Plaintiff's Grievance 16602604 raised concerns over the alleged inadequate treatment for
his HCV. Dkt. 51 at 76-80. Throughout the grievance process, Plaintiff repeated his claim he was
not receiving adequate treatment for HCV. *See id.* All elements of Plaintiff's inadequate medical
treatment claim in this lawsuit relate to his dissatisfaction with the treatment he received for
HCV. *See* Dkt. 96. *See* Dkt. 51-1 at 76-80; *Gomez,*177 F.Supp.2d at 979; *See also Mehari v. Cox*,
2009 WL 1405019, at *4 (E.D. Cal. May 19, 2009) (citing *Gomez,* 177 F.Supp 2d at 982);
*Torrence v. Pelkey,* 164 F.Supp.2d 264, 278–79 (D. Conn. 2001) (declining to require exhaustion
of new issues in medical care that arose from the "same series of events" concerning medical
care that had already been exhausted).

Similarly, Plaintiff argues his allegations related to the use of a Fibroscan, failure to
monitor, and failure to review treatment priorities are encompassed within Grievance 16602604
based on an application of the continuing violations doctrine. Dkt. 176 at 1-2. The Second, Fifth,
Seventh, Tenth, and Eleventh Circuits have applied the theory of the continuing violations
doctrine to exhaustion in prisoner civil rights cases. *See Turley v. Rednour,* 729 F.3d 645, 649-50
(7th Cir. 2013) ("In order to exhaust their remedies, prisoners need not file multiple, successive

grievances raising the same issue (such as prison conditions or policies) if the objectionable

condition is continuing."); *Johnson v. Killian,* 680 F.3d 234 (2d Cir. 2012) (per curiam) (holding

that a prisoner's 2005 exhausted grievance was sufficient to exhaust his 2007 claims based on a

continuing violation when the 2005 grievance raised the identical issue); *Parzyck v. Prison

Health Servs. Inc.,* 627 F.3d 1215, 1219 (11th Cir. 2010) (holding that a prisoner was "not

required to initiate another round of the administrative grievance process on the exact same issue

each time" an alleged deprivation of rights occurred"); *Howard v. Waide,* 534 F.3d 1227, 1244

(10th Cir. 2008) (after plaintiff had exhausted a grievance regarding harassment and threats, he

was not required to file a separate grievance for the same risks identified in the first grievance);

*Johnson v. Johnson*, 385 F.3d 503, 521 (5th Cir. 2004) (stating the plaintiff was not required to

file separate grievances to "exhaust claims that arose from the same continuing failure to protect

him from sexual assault.").

While the Ninth Circuit has yet to apply the continuing violations doctrine to exhaustion

in prisoner cases, numerous district courts in the Ninth Circuit have. *See Becker v. Sherman,*

2018 WL 4616281, at *5 (E.D. Cal. Sept. 25, 2018); *Saif'ullah v. Albritton,* 2017 WL 2834119,

at *9 (N.D. Cal. June 30, 2017) (quoting *Turley,* 729 F.3d at 650); *Holmes v. Estock*, 2021 WL

568790, at *16 (S.D. Cal. Feb. 16, 2021); *Bryant v. Fed. Bureau of Prisons,*  2014 WL 2472255,

at *6 (C.D. Cal. June 2, 2014). In addressing the continuing violations doctrine in a statute of

limitations context, the Ninth Circuit held that if the claim involves a "delayed, but inevitable,

consequence" of a previously-uncorrected wrong, it is part of a continuing violation. *Pouncil v.

Tilton,* 704 F.3d 568, 581 (9th Cir. 2012). Only if the more-recent incident involves an

"independently wrongful, discrete act" should it be treated as a separate, stand-alone claim. *Id.*

Applying this principle to exhaustion in prisoner civil rights cases, when a prisoner-plaintiff

1  grieves a continuing violation, the plaintiff is not required to file multiple, successive grievances

2  raising the same issue, but rather, the plaintiff can satisfy the exhaustion requirement once the

3  prison has received notice of and an opportunity to correct the problem. *Saif'ullah v. Albritton,*

4  2017 WL 2834119, at *9 (N.D. Cal. June 30, 2017) (quoting *Turley*, 729 F.3d at 650).

5        Here, it is undisputed in Grievance 16602604, Plaintiff complained he was not receiving

6  adequate treatment for HCV. *See* Dkt. 51 at 76-80. Thus, Plaintiff's claims related to the use of a

7  Fibroscan, failure to monitor, and a review of treatment priorities are ongoing problems related

8  to the inadequate treatment for HCV raised in Grievance 16602604. *See Turley*, 729 F.3d at 650;

9  *Holmes v. Estock*, 2021 WL 568790, at *17 (S.D. Cal. Feb. 16, 2021).

10        In the Supplemental Brief, Defendants cite to *Morton v. Hall,* 599 F.3d 942 (9th Cir.

11  2010). In *Morton,* the plaintiff's complaint alleged prison officials denied him visitation rights

12  and the officials failed to protect him from a violent assault. *Id.* The plaintiff filed a grievance

13  related to the denial of his visitation rights but presented no evidence he grieved the assault. *Id.*

14  at 944. The Ninth Circuit held the plaintiff had not properly exhausted his claim related to the

15  assault because the two incidents (assault and visitation) were disconnected and discrete. *See id.*

16  In contrast the facts in *Morton*, all elements of Plaintiff's Eighth Amendment claim relate to his

17  dissatisfaction with the treatment he received for HCV. *See* Dkt. 96. This is not a case where

18  Plaintiff has filed a lawsuit alleging several unrelated claims (e.g. lawsuit based on inadequate

19  medical treatment and retaliation, which would require separate exhaustion through the prison's

20  grievance process). *Cf. Curry v. Scott,* 249 F.3d 493, 505 (6th Cir. 2001) (claim was not

21  exhausted because it was "a separate claim, against a separate individual, premised on a separate

22  and independent legal theory"). Thus, the undersigned does not find Defendants' citation to

23  *Morton* persuasive. *See also Curry v. Scott,* 249 F.3d 493, 505 (6th Cir. 2001) (claim was not

24

1  exhausted because it was "a separate claim, against a separate individual, premised on a separate

2  and independent legal theory").

3       Defendants also argue a "claim" involves specific allegations about the acts or omissions

4  of a specific defendant, and thus, Plaintiff is advocating for an impermissible aggregation of

5  everything he alleges as evidence of a single claim regardless of whether he sought

6  administrative remedies for the multiple acts or omissions which occurred at multiple times and

7  are attributed to multiple individuals irrespective of whether each defendant personally

8  participated. Dkt. 175 at 2-3. However, while this argument may be persuasive in determining

9  personal participation or liability, Defendants conflate the issue of personal participation with

10 exhaustion. Dkt. 175 at 2. Whether Plaintiff's claim is exhausted is a separate issue from whether

11 Defendants personally participated or caused the alleged constitutional violations, and a finding

12 on exhaustion is not removing individual liability or permitting Defendants to be liable on a

13 claim even if they had no role in the alleged constitutional violation. *Compare Leer v. Murphy*,

14 844 F.2d 628, 633 (9th Cir. 1988) (to hold a defendant liable for damages, the wrongdoer must

15 *personally* cause a constitutional violation) *with Porter v. Nussle*, 534 U.S. 516, 524-25 (2002)

16 (The underlying premise of exhaustion is to "reduce the quantity and improve the quality of

17 prisoner suits" by affording prison officials the "time and opportunity to address complaints

18 internally before allowing the initiation of a federal case. In some instances, corrective action

19 taken in response to an inmate's grievance might improve prison administration and satisfy the

20 inmate, thereby obviating the need for litigation.").

21      Rather, under the well-developed persuasive authority on this issue "when a prisoner

22 plaintiff grieves a continuing violation, he need not file 'multiple, successive grievances raising

23 the same issue,' and can therefore satisfy his exhaustion requirement 'once the prison has

24

1  received notice of, and an opportunity to correct the problem.'" *Saif'ullah v. Albritton*, 2017 WL

2  2834119, at *9 (N.D. Cal. June 30, 2017) (quoting *Turley*, 729 F.3d at 650). Therefore, the

3  undersigned agrees with the Second, Fifth, Seventh, Tenth, and Eleventh Circuits and district

4  courts in the Ninth Circuit and finds the "continuing violation doctrine" applies to Plaintiff's

5  claims and as such, he "need not file multiple, success grievances raising the same issue ... if the

6  objectionable condition is continuing." *Turley*, 729 F.3d at 650.

7      Based on the foregoing, Defendants have not met their burden to prove the affirmative

8  defense of failure to exhaust administrative remedies. *See Jones*, 549 U.S. 216; *Wyatt*, 315 F.3d

9  at 1117–19. Therefore, Defendants' Motion should be denied as to Plaintiff's failure to exhaust

10  administrative remedies as to Plaintiff's use of a Fibroscan, failure to monitor, and failure to

11  review treatment priorities claims. Thus, the Court proceeds to consideration of the merits of

12  Plaintiff's Eighth Amendment claims.

13    **C. Eighth Amendment and Deliberate Indifference**

14      Defendants argue they are entitled to qualified immunity because Plaintiff cannot show

15  the deprivation of a constitutional right, framing their Motion under the first prong of the

16  qualified immunity analysis. Dkt. 160 at 8-10 (citing *Taylor v. Barkes,* 135 S. Ct. 2042, 2044

17  (2015) (per curium) (internal quotation marks omitted) ("The Defendants are all entitled to

18  qualified immunity because Reed cannot show, "first,[that he] suffered a deprivation of a

19  constitutional or statutory right; and second [that such] right was 'clearly established' at the time

20  of the alleged misconduct."). Specifically, Defendants argue: (1) there is no evidence Plaintiff's

21  HCV was rapidly progressing; (2) there was no constitutional violation based solely on any

22  Defendants' involvement in the grievance process; (3) none of the Defendants were responsible

23  for monitoring Plaintiff's condition or reviewing treatment priorities; and (4) Plaintiff's

24

Fibroscan claim fails because a medical decision not to order an x-ray or like measures does not violate the Eighth Amendment. Dkt. 160 at 8-16.

In response, Plaintiff argues: (1) this case is not a "difference of medical opinion"; (2) Defendants knew there was an excessive risk to Plaintiff's health; (3) the grievance process arguments are irrelevant; (4) Defendants cannot use negligence as a shield; (5) specific claims should not be dismissed; and (6) reliance on a policy does not provide a defense. Plaintiff argues there are genuine disputes of material fact. Dkt. 162 at 6-19.

      1.   Personal Participation and Deliberate Indifference Standard

A plaintiff must prove that the particular defendant has caused or personally participated in causing the deprivation of a particular protected constitutional right. *Arnold v. IBM,* 637 F.2d 1350, 1355 (9th Cir. 1981); *Sherman v. Yakahi,* 549 F.2d 1287, 1290 (9th Cir. 1977). To be liable for "causing" the deprivation of a constitutional right, the particular defendant must commit an affirmative act, or omit to perform an act, that he or she is legally required to do, and which causes the plaintiff's deprivation. *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978). Sweeping conclusory allegations against an official are insufficient to state a claim for relief. The plaintiff must set forth specific facts showing a causal connection between each defendant's actions and the harm allegedly suffered by plaintiff. *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir. 1980); *Rizzo v. Goode,* 423 U.S. 362, 371 (1976).

Supervisory officials cannot be held liable under a theory of *respondeat superior*. *See Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). Personal participation is an essential element of a § 1983 claim. *Johnson,* 588 F.2d at 743–44. Prison officials who are not medical providers are not deliberately indifferent when they defer to the judgment of treating medical providers. *See Spruill v. Gillis,* 372 F.3d 218, 236 (3rd Cir. 2004); *Hayes v. Snyder,* 546 F.3d 516, 526–28 (7th

1  Cir. 2008); *cf. Peralta v. Dillard,* 744 F3d 1076, 1086–87 (9th Cir. 2014) (non-specialist doctor

2  was not deliberately indifferent when he deferred to specialist).

3       Deliberate indifference to an inmate's serious medical needs violates the Eighth

4  Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429

5  U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an

6  Eighth Amendment claim based on a condition of confinement, such as medical care, a prisoner-

7  plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was,

8  subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511

9  U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs

10  of an Eighth Amendment deliberate indifference claim.

11       <u>Objective Prong:</u> To satisfy the objective prong, there must be a deprivation of a

12  "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition

13  "could result in further significant injury" or the " 'unnecessary and wanton infliction of pain.' "

14  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).[9]

15       <u>Subjective Prong:</u>  For the subjective prong, there must be deliberate indifference. A

16  defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious

17  harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at

18  837. The defendant must not only "be aware of facts from which the inference could be drawn

19  that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.*

20  Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally

21

22  _____

23       [9] The parties do not dispute whether Plaintiff suffered from a serious medical need. Even if they had, the undisputed evidence shows  HCV is an infectious disease affecting one of the human body's essential organs, which presents a serious medical need. *See Andrews v. Cervantes*, 493 F.3d 1047, 1055 & n.8 (9th Cir. 2007) (HCV is a

24  chronic disease that "quite obviously cause[s] serious health problems[] and can result in death").

interfere with medical treatment, or it may be inferred from the way in which prison officials

provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that

a delay of seven months in providing medical care during which a medical condition was left

virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present

colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d

1133, 1136 (9th Cir. 1997) (*en banc* ). There must be "harm caused by the indifference,"

although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

As an initial matter, the parties generally disagree on whether Plaintiff is raising a broad

and general inadequate medical treatment claim, or whether each claim should be addressed

separately. Dkt. 160, 162, 175, 176. In his original Response, Plaintiff argued that he did not

have a separate "Fibroscan claim," "monitoring claim" or a "review of treatment priorities

claim," nor are these elements of his claims. Rather, he alleges these are allegations that will be

presented to the jury in the form of evidence.[10] Dkt. 162 at 13-14.

The problem with Plaintiff's contention is that by not raising individual claims and

arguing an overall deliberate indifference theory, he fails to account for the requirement that each

Defendant personally participate in each constitutional violation. *Arnold v. IBM*, 637 F.2d 1350,

1355 (9th Cir. 1981). Plaintiff is suing each Defendant individually, and as a result, he must

show that each Defendant was deliberately indifferent. *See id.* His argument that his "claims" are

evidence does not change the nature of this lawsuit or the law. Rather, each Defendant had

varying degrees of involvement, or lack thereof, with Plaintiff's medical treatment and so the

---

[10] When challenged by Defendants, in his Supplemental Response, Plaintiff modified his argument, contending "each claim is supported by individual conduct that violated the Constitution and caused harm to Mr. Reed." Dkt. 176 at 3-6.

1  acts of each Defendant must be analyzed separately as they relate to each instance of contact

2  with Plaintiff in determining whether summary judgment is appropriate.

3          Because subjective knowledge is inherently a person-by-person determination, the Court

4  cannot adopt Plaintiff's *en masse* approach. Thus, despite Plaintiff's argument to construe his

5  "claims" as "evidence," the Court considers Plaintiff's Third Amended Complaint to raise claims

6  of deliberate indifference which fall into four categories of allegedly inadequate medical

7  treatment: (1) Defendant (Smith) Kariko's October 2015 clinical examination; (2) the 2016 CRC

8  decision (Defendants Hammond and Strick were voting members); (3) Defendant Hammond's

9  review of and response to Plaintiff's 2016 grievances/letters; and (4) the failure to use a

10  Fibroscan, monitor, and review treatment priorities. *See* Dkt. 96.

11         The Court proceeds to determine whether a factual question exists that each individual

12  Defendant knew of a serious medical need and failed to adequately respond based on an

13  examination of the subjective awareness of each individual Defendant.[11]

14

15

16

17  ─────────────────────────

18      [11] After oral argument, the undersigned asked the parties to submit supplemental briefing. Dkt. 173. With
respect to Plaintiff's Eighth Amendment claim, the undersigned asked the parties to address whether there was any
19  evidence of personal participation in the alleged constitutional violations. Dkt. 173. Specifically, the undersigned
stated:

20          This briefing should address whether there is any admissible evidence that each Defendant
          committed an affirmative act (or omitted to perform an act) which caused the alleged constitutional
          violation and whether there is a causal connection between each Defendant and the harm allegedly
21          suffered by Plaintiff. The parties should specifically address each Defendant's job description and
          responsibilities, actions taken through the relevant time period (including specific dates on which
22          any actions were taken), and responses to grievances and/or letters. The parties should also address
          whether the decisions by the Hepatitis C Care Review Committee ("HCV CRC") reflect an
          individual opinion by each Defendant.
23
    Dkt. 173 at 2.
24

2.  <u>October 2015 Clinical Examination – Defendant (Smith) Kariko</u>

Defendants argue Defendant (Smith) Kariko did not personally participate in any alleged violation of Plaintiff's constitutional rights. Dkt. 160; Dkt. 175 at 11-12. Plaintiff contends Defendant (Smith) Kariko's failed to adequately examine Plaintiff and failed to recommend treatment which caused his HCV treatment to be delayed. Dkt. 176 at 7.

It is undisputed on October 1, 2015, Defendant (Smith) Kariko examined Plaintiff. Dkt. 42-1 at 62-65. At or around the time of the examination, Defendant (Smith) Kariko filled out a form titled "Hepatitis C Treatment History and Physical." *Id.* On page three of the form, titled "Plan," Defendant (Smith) Kariko did not check the box "Recommend treatment now." *Id.* Defendant (Smith) Kariko did check a box labeled "Refer to Hepatitis CRC." *Id.* The undisputed evidence reflects Defendant (Smith) Kariko was not Plaintiff's primary care provider. *See* Dkt. 42-1 at 62-65; Dkt. 110 at 2.

Even assuming Defendant (Smith) Kariko's one-time examination of Plaintiff and referral to the CRC is found to be personal participation, the undisputed evidence reflects Defendant (Smith) Kariko did not act with deliberate indifference. For example, nothing in the record demonstrates Defendant (Smith) Kariko recommended Plaintiff's case *not* be referred to the CRC, or that she recommended the CRC *not* pursue further treatment. The undisputed fact that Defendant (Smith) Kariko initiated the CRC evaluation process hardly demonstrates an attitude of deliberate indifference, but rather reflects the opposite.

The fact that Defendant (Smith) Kariko did not check the box "Recommend treatment now" does not change this analysis because the record does not reflect what "treatment" Plaintiff would have received. Plaintiff does not present any evidence Defendant (Smith) Kariko had the authority to provide any immediate treatment with DAAs for HCV, rather that decision was left

1    to the CRC. *See Hamby,* 2015 WL 1263253 (no showing was made that the defendant believed a

2    referral for surgical evaluation necessarily would result in a recommendation *for* surgery to be

3    performed, even if he believed surgery would relieve all of plaintiff's pain, thus, there was no

4    Eighth Amendment violation). The record is undisputed Defendant (Smith) Kariko did not

5    participate in the CRC decision.

6        And even if Defendant (Smith) Kariko acted erroneously by failing to recommend

7    treatment or failing to recognize signs of extrahepatic symptoms, a merely negligent

8    interpretation of symptoms is not enough to show deliberate indifference absent some other

9    evidence of Defendant (Smith) Kariko's subjective intent. *See Wilhelm v. Rotman*, 680 F.3d

10   1113, 1122-23 (9th Cir. 2012) (finding no deliberate indifference but merely a "negligent

11   misdiagnosis" by defendant-doctor who decided not to operate because he thought plaintiff was

12   not suffering from a hernia). The deliberate indifference doctrine is limited in scope. "[A]n

13   *inadvertent* failure to provide adequate medical care" does not, by itself, state a deliberate

14   indifference claim for § 1983 purposes. *McGuckin*, 974 F.2d at 1060 ("[a] defendant must

15   purposefully ignore or fail to respond to a prisoner's pain or possible medical need"; *Hutchinson*,

16   838 F.2d at 394 ("[m]ere negligence in diagnosing or treating a medical condition, without more,

17   does not violate a prisoner's Eighth Amendment rights").

18       In his opposition, Plaintiff points to evidence regarding  Defendant (Smith) Kariko's

19   position as the Facility Medical Director ("FMD") at SCCC, and she had responsibility to

20   "provide medical care and oversee the medical care that the advanced practitioners were

21   providing." Dkt. 176 at 7 (citing Dkt. 110 at 1; Dkt. 164, Exhibit D, (Smith) Kariko Dep. at 13-

22   14). However, even assuming Defendant (Smith) Kariko had the responsibility to supervise other

23   providers which gave care to Plaintiff, that is nothing more than a theory of vicarious liability,

24

1    which is an insufficient basis for liability under § 1983. *See Hansen v. Black,* 885 F.2d 42, 645-

2    646 (9th Cir. 1989).

3        Accordingly, considering the evidence in the light most favorable to Plaintiff, no

4    reasonable fact finder could conclude that Defendant (Smith) Kariko was deliberately indifferent

5    with respect to her October 1, 2015 examination. Therefore, the undersigned recommends

6    granting Defendants' Motion as to this claim.

7            3.    2016 CRC Decision – Defendants Hammond and Strick

8        Defendants argue they have presented evidence that at the time of the CRC's decision,

9    nothing indicated Plaintiff's HCV infection was progressing rapidly and Defendants Hammond

10   and Strick did not personally participate in any alleged constitutional violations. Dkt. 160 at 5-7;

11   Dkt. 175 at 9-10. Plaintiff argues Defendants Hammond and Strick's failure to act and failure to

12   properly supervise delayed Plaintiff's treatment and their decision was medically unacceptable.

13   Dkt. 162; Dkt. 176 at 5-7.

14       It is undisputed Ms. Eschbach presented Plaintiff's case to the CRC on January 7, 2016.

15   Dkt. 71 at 3-4. Ms. Eschbach did not believe Plaintiff warranted immediate treatment with

16   DAAs, but on Plaintiff's request, she presented his case to the CRC for review. *Id.* at 3-4.  Ms.

17   Eschbach testified Plaintiff's symptoms at the time his case was presented to the CRC were

18   attributed to arthritis, Barrett's esophagus, and migraine headaches, but these are not symptoms

19   typically associated with HCV. Dkt. 71 at 4.

20       It is also undisputed Defendants Strick and Hammond were voting members of the CRC

21   on January 7, 2016 at which time the CRC voted to defer Plaintiff's treatment with DAAs. Dkt.

22   70, Strick Decl., at 1-2; Dkt. 109 at 3. Members of the CRC are not provided with a prisoner's

23   medical file, but rather they receive a synopsis thereof. Dkt. 42-1 at 66-68. Defendant Hammond

24

1  testified he does not recall how he or other members of the CRC voted at the meeting. Dkt. 164-

2  1, Hammond Deposition at 86. It is undisputed that neither Defendant Hammond nor Strick

3  personally treated Plaintiff. *See id.;* Dkt. 70, Strick Decl. The examination findings reported to

4  the CRC did not include any findings of liver disease such as "jaundice, ascites, encephalopathy,

5  spider angiomata, palmar erythema, arthritis, vasculitic rash, etc." Dkt. 42-1 at 67.  The

6  committee report the CRC released with its determination reads:

7      61yo M with HCV GT 1a x ~35 yrs. Liver bx F2 6/2014. Current APRI 0.69. Pt
        does not meet criteria for tx per protocol. Pt requested presented at Hep C CRC for
8      further evaluation. PMHx of arthritis, Barrett's esophagus (being monitored) and
        migraines. He just had a liver biopsy last year. His APRI is relatively low and has
9      not significantly changed over the time period since biopsy to suspect that there has
        been unusually rapid progression of his fibrosis. The risks of a repeat liver biopsy
10     outweigh the benefits, since it is unlikely to be significantly different from the last
        one. The patient should be reassured that he only has F2 fibrosis after ~35 years of
11     the disease. Given he is 61 yo, there is a high likelihood he will die of an alternative
        process. At this point in time, he does not meet DOC criteria for Hep C treatment
12     given his low-moderate fibrosis and no co-morbidity putting him at a high risk
        category. Would continue to monitor the patient every year and reassess eligibility
13     for tx as per protocol.

14  Dkt. 42-1 at 67.[12]

15      Plaintiff has not identified, and the Court has not found any reference in the record to

16  reflect whether Defendant Hammond or Defendant Strick voted for or against deferring

17  Plaintiff's treatment. Aside from the CRC's written decision, Plaintiff has not presented evidence

18  as to what was discussed during the CRC's evaluation which would indicate a specific level of

19

20      [12] Plaintiff also cites to Judge Settle's prior order wherein Judge Settle stated: "In other words,
    notwithstanding that Defendants knew Plaintiff had been suffering symptoms for years and knew both the cause of
21  the symptoms and the course of treatment required to effectively treat HCV, Defendants intentionally delayed such
    treatment until Plaintiff's liver damage grew so severe that treatment could no longer be delayed without risk of
22  dangerous complications and death." Dkt. 62 at 6. But the context in which this statement was made was in finding
    that the CRC categorically denied treatment because Plaintiff's F2 fibrosis score was not sufficiently severe to
23  warrant treatment. *See id.* at 5-6. As discussed herein, the record before the Court has been developed and now
    reflects Defendants' decision was not made solely based on a categorial denial. *See* Dkt. 90 (Judge Settle later found
    there was no clearly established law on the issue of whether the DOC's HCV policy was unconstitutional on its
24  face.).

1    involvement by Defendant Hammond or Defendant Strick. While Plaintiff attempts to address

2    Defendant Hammond and Defendant Strick's actions collectively as members of the CRC and

3    argue this shows personal participation and ultimately deliberate indifference, the Court must

4    individually address each individual Defendant's subjective knowledge. The Court must consider

5    the evidence presented concerning each Defendant individually. *See Arnold v. IBM,* 637 F.2d

6    1350, 1355 (9th Cir. 1981). The decision to defer Plaintiff's treatment was made by all of the

7    members of the CRC functioning as a committee, not Defendants Hammond and Strick acting as

8    individuals. Because the decision was made by the CRC as a whole, the evidence does not reflect

9    Defendant Hammond or Defendant Strick had any authority, acting as individuals, to decide

10    whether Plaintiff would receive treatment and what treatment that would be. Plaintiff has not

11    cited to any authority that a vote as part of a committee or the CRC is sufficient for personal

12    participation. *But see Hamby v. Hammond*, 2015 WL 1263253, at *21 (W.D. Wash. Mar. 19,

13    2015), *aff'd,* 821 F.3d 1085 (9th Cir. 2016) (the defendant, the same Dr. Hammond as this case,

14    presided over a CRC meeting but "there was no indication as to the level or extent of his

15    participation in that meeting, what specifically was discussed there concerning plaintiff's hernia

16    condition and/or treatment therefore, or how defendant Hammond voted" and thus, no showing

17    that Defendant Hammond was sufficiently aware of a significant risk of harm to the plaintiff.)

18        Plaintiff asserts Defendant Hammond was not an "ordinary" CRC participant, but rather

19    his role on the CRC was due, at least in part, to the cost of new drugs and the Assistant Secretary

20    for Health Services thought it was important for the CMO to be on the CRC. Dkt. 176 at 4-5

21    (citing Dkt. 164-1, Exhibit A, Hammond Dep. at 73-75). However, the Court does not find this

22    evidence shows that Defendant Hammond had a controlling role in his participation in the

23    January 2016 CRC decision, nor does it show deliberate indifference. For example, Plaintiff does

24

1   not provide evidence to show Defendant Hammond took any action or made any statements

2   which influenced the CRC to vote in such a way to achieve a cost-savings objective.

3        In sum, the evidence does not show the decisions by the CRC reflect an individual action

4   by Defendant Hammond or Defendant Strick. While the Court acknowledges Plaintiff's

5   frustration in the CRC/committee based approach to medical treatment decisions and care in

6   prisons, Plaintiff has not presented facts to demonstrate deliberate indifference based on

7   Defendant Hammond or Defendant Strick's participation in the 2016 CRC decision. *See*

8   *Downing v. Clinton,* 2006 WL 3054314, at *20 (E.D. Wash. Oct. 26, 2006) ("The undersigned is

9   sympathetic with and shares in Plaintiff's frustration with the chain-of-command and/or

10  committee approach to the delivery of medical care. Indeed, most can agree that it is, or should

11  be, a national embarrassment and sorrow that despite the wealth of this nation, there remain

12  questions of adequacy of health care for poor persons and for institutionalized persons. However,

13  under the facts of record in the captioned case, these issues are not federal constitutional matters

14  addressable by federal courts. Rather, improvement of the OHP process must be addressed

15  through the legislature.").

16        Even assuming Defendants Hammond and Strick voted in favor of the decision to defer

17  treatment, and that they could be held personally and individually responsible for the CRC's

18  decision, the examination findings reported to the CRC did not include any findings of liver

19  disease or symptoms which the CRC attributed to liver disease or a rapid progression of

20  Plaintiff's HCV *See* Dkt. 42-1 at 67. Defendant Hammond testified the symptoms Plaintiff

21  claimed to have at the time of the CRC's decision did not indicate his disease was progressing

22  rapidly, such that treatment with DAAs was medically necessary at that time. Dkt. 70, Strick

23  Decl., at 1-3; Dkt. 109 at 4; Dkt. 109-1 at 50-51. Defendant Strick also testified the symptoms

24

1  Plaintiff claimed to have did not, in their medical opinion, indicate his HCV was progressing

2  rapidly. *See* Dkt. 70, Strick Decl., at 7 ("the CRC considered the individual facts and

3  circumstances of his case in order to determine whether treatment with DAAs was medically

4  necessary given the information known by the CRC at the time."). The CRC relied on

5  information they received from other medical staff, which they did not attribute to an immediate

6  need for treatment with DAAs.[13] *See Gibson v. Vanjani,* 2018 WL 4053458, at *7 (N.D. Cal.

7  Aug. 24, 2018), *aff'd,* 790 F. App'x 116 (9th Cir. 2020) (granting summary judgment in favor of

8  prison physicians when they deferred Plaintiff's treatment and continued to monitor the plaintiff

9  for HCV based on recent test results indicating treatment was not needed and deferring treatment

10 was in line with applicable guidelines).

11      Plaintiff disputes their involvement, arguing Defendants Hammond and Strick should

12 have investigated Plaintiff's medical treatment, and they knew it was not medically acceptable to

13 deny treatment. *See* Dkt. 176 at 5-6. However, aside from arguing supervisory liability, Plaintiff

14 has not pointed to any evidence indicating either Defendant Hammond or Defendant Strick were

15 aware of information, which should have made them aware of a significant risk of substantial

16 harm to Plaintiff's health or safety that immediate treatment with DAAs was necessary.[14] *See*

17 *Hamby v. Hammond,* 2015 WL 1263253, at *21 (W.D. Wash. Mar. 19, 2015), *aff'd,* 821 F.3d

18

19

20 [13] Judge Settle previously held there was no clearly established law on the issue of whether the DOC's
   HCV policy was unconstitutional on its face. Dkt. 90 at 2. Judge Settle concluded that the key distinction was that
   the policy included exceptions to the categorical denial of treatment and the exceptions were based on an

21 individual's objective symptoms. *See id.* Thus, to the extent Plaintiff's claims continue to challenge Defendants
   actions pursuant to DOC policy, Defendants are entitled to qualified immunity. To the extent Plaintiff argues that
   Defendants either failed to follow the DOC policy or that he had extrahepatic symptoms, *see* Dkt. 162 at 16, the

22 Court has addressed these arguments in conjunction with the individual Defendants, *see supra.*
   [14] To the extent Plaintiff argues Defendants Hammond and Strick and the CRC members were generally
   familiar and relied on the AASLD/IDSA Guidelines related to HCV treatment, and in light of his training and

23 familiarity, a reasonable jury could infer Defendants knew HCV at the F2 level presented a serious medical need and
   excessive risk to Plaintiff, this argument reflects a difference of opinion which the Court below with respect to Dr.

24 Gish and Dr. Zawitz's expert opinions, *see supra.*

1    1085 (9th Cir. 2016). And even if Defendants Hammond and Strick and the CRC erroneously

2    attributed Plaintiff's symptoms presented to the CRC as not related to HCV or not indicative of a

3    rapid progression of Plaintiff's HCV requiring immediate treatment with DAAs, a merely

4    negligent interpretation of symptoms is not enough to show deliberate indifference absent some

5    other evidence of Defendant Hammond or Defendant Strick's subjective intent. *Toguchi,* 391

6    F.3d at 1060; *Wilhelm*, 680 F.3d at 1122-23; *Farmer*, 511 U.S. at 835.

7         To support his claim that Defendants Hammond and Strick acted with deliberate

8    indifference, Plaintiff points to a statement from the CRC that Plaintiff would likely die of an

9    alternative process. Dkt. 162; Dkt. 176. Plaintiff interprets this statement as expressing a belief

10   that the CRC had no obligation to provide Plaintiff with medical treatment. Dkt. 176 at 13.

11   Judge Settle previously indicated "[a] reasonable juror could conclude that such an explicit

12   statement establishes deliberate indifferent to Reed's serious medical needs if legitimate

13   extrahepatic symptoms were presented to the [CRC] and subsequently ignored." Dkt. 90 at 6.

14   After further development of the record, Defendants have presented evidence explaining the

15   statement. In his deposition, Defendant Hammond explained the statement, providing:

16        [A] person who's 61, who has an F-2 level of Fibrosis, and presumably has had the
          hepatitis C infection for decades, was having slow advancement of the fibrosis, that
17        statistically would not be expected to develop clinical cirrhosis or hepatic
          insufficiency that would lead to death.
18        …
          Meaning there's a low likelihood he would die of hepatic insufficiency or cirrhosis
19        and therefore he would die of some other common disease such as heart disease or
          cancer.
20
21   Dkt. 164, Exhibit A, Hammond Dep. at 89-90. When asked about the importance of treating

     symptoms from a condition, Defendant Hammond responded:
22
23        If a person were experiencing significant symptoms that were thought to be related
          to a disease process and an ongoing disease process, that in my mind would be a
          clinical factor in favor of the urgency of treatment.
24

REPORT AND RECOMMENDATION - 36

Dkt. 164, Exhibit A, Hammond Dep. at 89-90.

When the CRC's statement is read in the context in which it arose, along with Defendant Hammond's deposition testimony, it is insufficient, without more, to infer the CRC intended to deny Plaintiff treatment because of his age or because Plaintiff would likely die of an alternative process. Rather, the evidence reflects the totality of the CRC's decision struck a balance between Plaintiff's recent biopsy and test results, lack of extrahepatic symptoms, his lack of co-morbidities, and his age. Thus, the evidence does not establish an issue of fact as to whether the CRC's statement constitutes a pretextual reason for deferring treatment.

Further, Judge Settle's prior conclusion that "[a] reasonable juror could conclude that such an explicit statement establishes deliberate indifferent to Reed's serious medical needs" requires the conditional premise "if legitimate extrahepatic symptoms were presented to the [CRC] and subsequently ignored" to be correct. But, as discussed above, Defendants Hammond and Strick and the CRC did not attribute any of Plaintiff's symptoms as presented to the CRC as indicating a rapid progression of his HCV warranting immediate treatment with DAAs. *See* Dkt. 70, Strick Decl., at 1-2, 7; Dkt. 109 at 4, Dkt. 109-1 at 50-51. *See Gibson v. Vanjani,* 2018 WL 4053458, at *11–12 (N.D. Cal. Aug. 24, 2018) (granting summary judgment to prison doctors when "[t]here was no evidence that a doctor ever attributed any of the [medical symptoms] to HCV."). As a result, because the record shows there were no symptoms presented to the CRC which Defendant Strick, Defendant Hammond or the CRC attributed to a rapid progression of Plaintiff's HCV and ignored, there is no evidence in the record to support the conditional

1 premise. Thus, the Court does not find a factual question as to whether they were deliberately

2 indifferent.[15]

3         Plaintiff argues there is a factual dispute regarding whether the medical opinions relied

4 upon are medically acceptable. Dkt. 162 at 6-8. Plaintiff points to the opinion of his expert, Dr.

5 Gish, which provides:

6         The decision to delay Mr. Reed's treatment based on his fibrosis score cannot be
fairly considered a 'difference of medical opinion' compared to the decision to treat

7         him. It was not medically acceptable to delay treatment, so there was not a sound
'medical opinion' not to treat him at that time. The decision to delay treatment was

8         an incorrect and unsound medical decision that fell below the established standard
of care. Treating Mr. Reed would have been a sound and correct medical decision.

9         Immediate treatment was an overwhelmingly better option.

10 Dkt. 165, Gish Declaration, at 21; *see also* Gish Decl., at pages 4-5 (no medical justification for

11 delaying treatment based on fibrosis score).[16]

12         On the other hand, according to Defendants' expert, Dr. Chad Zawitz, M.D., Defendants'

13 deferral of treatment for early stage fibrosis with ongoing interval monitoring was consistent

14

15

16     [15] Dr. Gish testified Plaintiff showed signs extrahepatic that were not adequately evaluated by his medical providers and it was "likely" he had extrahepatic symptoms that were not identified by Plaintiff's providers. *See id.* at 21-22. However, Dr. Gish testified the extrahepatic symptoms Plaintiff may have had were "subtle markers" and

17 it was "highly variable" whether another medical provider would be able to identify those markers. Dkt. 161, Gish Dep., at 7-8. In addition, Dr. Gish did not have any specific opinion as to the named Defendants, rather he generally opined "all providers that were involved in denying care and treatment for Mr. Reed fell below the standard of

18 care…." *See* Dkt. 161, Gish Dep., at 9-10 (Defendant Hammond); 10-12 (Defendant Strick); 12-13 (Defendant (Smith) Kariko). Thus, although Plaintiff contends Dr. Gish's opinion presents an issue of material fact, the Court finds this evidence does not demonstrate Defendants Hammond or Strick attributed Plaintiff's symptoms which

19 were presented to the CRC to his HCV. Dr. Gish's opinion is also discussed in more detail below, *see supra.*

20     [16] Plaintiff also points to another treating physician who recommended treatment in 2012, Dkt. 162 at 7 (citing Dkt. 51-1 at 44) (the citation actually refers to a form dated May 2014). However, there is no indication as to

21 what treatment the physician recommended, rather the "Recommend treatment now" box is checked. Further, this form was completed before Plaintiff's liver biopsy in June 2014 which indicated a F2 fibrosis score. *See* Dkt. 96 at 3; Dkt. 71 at 2. Thus, the Court concludes this evidence is not sufficient to establish another provider recommended

22 Plaintiff be treated with DAAs immediately or that the CRC's decision was medically unacceptable. In addition, Plaintiff points to testimony from Ms. Eschbach wherein she stated "they all should get treated … Yeah. I'm a

23 liberal. I believe that." Dkt. 164, Exhibit C, Eschbach Dep. at 52. She further clarified, "But I'm in no way an expert[,]" and that she was not qualified to make a "treatment call." *Id.* at 59-60. Based on Ms. Eschbach's testimony she is not an expert and not qualified to make a treatment decision, the Court does not find this citation to

24 the record persuasive to establish an issue of fact.

1    with the general practice in the community at large at that time. Dkt. 156-1 at 25-26, 29. Dr.

2    Zawitz opined Plaintiff's symptoms were not of the nature outlined or implied in the DOC HCV

3    protocol and are not the type of extrahepatic symptoms which indicate a rapid progression. *Id.* at

4    26. Dr. Zawitz opined the CRC's 2016 decision was consistent with their active protocol as well

5    as the current standard of care at that time. Dkt. 156-1 at 26.

6        A mere difference of opinion as to which medically acceptable course of treatment

7    should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242

8    (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's

9    evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed

10   only a difference of opinion as to proper course of care where prison medical staff treated his

11   recurring abscesses with medicines and hot packs). In the context of HCV treatment, several

12   district courts have found a prisoner's disagreement with a course of treatment amounts only to a

13   difference of medical opinion. *See Dotson v. Wilkinson,* 477 F.Supp.2d 838, 849 (N.D. Ohio

14   2007) ("[Plaintiff's] difference in opinion with prison medical personnel regarding the

15   appropriate diagnoses and treatment for his Hepatitis C are not enough to state a deliberate

16   indifference Claim."); *Clarke v. Blais,* 473 F.Supp.2d 124, 125–26 & n. 4 (D. Me. 2007)

17   (inmate's claims against jail's medical services provider for failure to treat inmate's hepatitis C

18   with anti-viral therapy "boil down to [a] disagreement with the chosen course of treatment, and

19   that is not the basis for a constitutional claim"); *Hollis v. Dir. of Corr.,* 560 F. Supp. 2d 920,

20   926–27 (C.D. Cal. 2008) (physicians failure to authorize a liver biopsy for a prisoner-plaintiff

21   and failure to provide him with pegylated interferon and ribavirin treatment constituted nothing

22   more than "[a] difference of opinion" about his medical treatment that "does not amount  to a

23   deliberate indifference to [plaintiff's] serious medical needs.") (internal citations omitted); *Woods*

24

1  *v. Harrington*, 2010 WL 4624125, at *3 (E.D. Cal. Nov. 4, 2010) (denying treatment for

2  hepatitis C to a prisoner because he does not meet the treatment program requirements does not

3  amount to deliberate indifference); *Edrosa v. Chau*, 2020 WL 5500217, at *4 (S.D. Cal. Sept. 11,

4  2020) (allegations a prison's criteria for HCV treatment was defective because they did not

5  comport with a renowned hepatologist amounted to a difference of medical opinion and failed to

6  state a claim for relief).

7       "[T]o prevail on a claim involving choices between alternative courses of treatment, a

8  prisoner must show that the chosen course of treatment 'was medically unacceptable under the

9  circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's]

10 health.' " *Toguchi*, 391 F.3d at 1058 (second alteration in original). However, it is not enough to

11 simply point to Dr. Gish's contrary opinion to demonstrate the CRC's decision was medically

12 unacceptable.

13      The First, Fifth, and Ninth Circuits have analyzed the meaning of "medically

14 unacceptable under the circumstances," in the context of gender reassignment surgery for

15 prisoners. *See Kosilek v. Spencer*, 774 F.3d 63, 91–92 (1st Cir. 2014) (The First Circuit held

16 "[t]he choice of a medical option that, although disfavored by some in the field, is presented by

17 competent professionals does not exhibit a level of inattention or callousness to a prisoner's

18 needs rising to a constitutional violation."); *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019)

19 (the standard for determining that treatment is medically unacceptable requires "universal

20 acceptance" in the medical community that a particular course of treatment is necessary. Where

21 "there is robust and substantial good faith disagreement dividing respected members of the

22 expert medical community, there can be no claim under the Eighth Amendment.").

23

24

1    The Ninth Circuit addressed the issue in the context of gender dysphoria in *Edmo v.*

2    *Corizon, Inc.,* 935 F.3d 757, 786 (9th Cir. 2019). The Ninth Circuit applied the law of *Kosilek*

3    and *Gibson* but disagreed with those cases on the facts. *See id.* The Ninth Circuit found the facts

4    were different than *Kosilek,* as it was not presented with the case of "dueling experts" but rather

5    the district court had permissibly credited the opinions of the plaintiff's expert that surgery was

6    necessary because the experts were well-qualified to render such opinions and the state's treating

7    physician and medical experts lacked expertise and either incredibly applied (or did not apply)

8    the appropriate standards of care. *Edmo,* 935 F.3d at 787-88.

9        Here, the medical evidence differs from *Edmo*. Rather, similar to *Kosilek*, the Court is

10   presented with qualified and credited experts disagreeing about whether Plaintiff should have

11   received immediate treatment with DAAs. Thus, on the record before it, the Court concludes

12   either of two courses of treatment (immediate treatment with DAAs v. deferring treatment and

13   monitoring) were medically acceptable. *Kosilek*, 774 F.3d at 90. In light of those medically

14   acceptable alternatives, it is not the place of the Court to "second guess medical judgments or to

15   require that the DOC adopt the more compassionate of two adequate options." *Id.* (quotation

16   omitted). *See Campbell v. Kallas*, 936 F.3d 536, 549 (7th Cir. 2019) ("[A] factfinder may infer

17   deliberate indifference only where a prison medical professional makes 'a medical decision that

18   has no support in the medical community' and provides 'a suspect rational … for making it.' …

19   Prison healthcare providers necessarily exercise medical judgment—and thus by definition do

20   not act with deliberate indifference—when they base treatment decisions on accepted national

21   standards and the advice of an expert.").

22       Thus, even if Plaintiff had demonstrated personal participation on behalf of Defendants

23   Hammond and Strick, he has not presented evidence that the CRC's decision to defer treatment

24

1  was medically unacceptable under the circumstances or in conscious disregard of an excessive

2  risk to Plaintiff's health. Thus, the Court recommends Defendants' Motion be granted as to this

3  claim.

4         4.   Plaintiff's Grievances and Letters – Defendant Hammond

5         Defendants argue although Defendant Hammond reviewed Plaintiff's letters claiming he

6  was being denied medical care, the symptoms Plaintiff claimed to have were not related to HCV

7  or were non-specific such that they could be associated with other conditions. Dkt. 160 at 5-7.

8  Plaintiff argues Defendant Hammond's role in the grievance process should have triggered him

9  to intervene or investigate Plaintiff's HCV treatment. Dkt. 176 at 5-6.[17]

10        It is undisputed  Defendant Hammond reviewed Plaintiff's grievances after the January

11 2016 CRC decision and Plaintiff's letters dated February 2, 2016 and February 5, 2016. Dkt. 51

12 at 76-78; Dkt. 109 at 3, 4-5; Dkt. 164-1, Hammond Dep at 36-38. In responding to Plaintiff's

13 Level II grievance, Defendant Hammond provided the following:

14        I received your Level I and Level II grievance, the investigation, and the
          responses and find them to be adequately investigated. I have read your Level III
15        appeal. You grieve not being provided treatment for Hepatitis C.

16        As explained in the [L]evel I and II grievance responses your expressed
          understanding of the reasoning behind the decision in your case not to provide
17        hepatitis C treatment at this time demonstrates misunderstanding of the clinical
          decision making in your case. The standard DOC protocol for management of
18        hepatitis C has been followed in your case and treatment has been withheld at this
          point because the degree of your liver disease does not make treatment medically
19        necessary at this time. You are welcome to discuss further the reasoning behind
          your decision making in your case with the SCCC Infection Prevention Nurse or
20        your primary care provider. Your condition will be monitored to assess if and when
          treatment might become medically necessary.

21

22

23 —————————————————

24 [17] Plaintiff does not argue Defendant Strick's receipt of Plaintiff's grievances or letters establishes any
   personal participation. *See* Dkt. 176 at 6-7.

Your grievance is not supported and I concur with level I and II grievance responses. I encourage you to work collaboratively with your health care providers to attain the best medically necessary care for your health conditions.

You remain free to pursue additional care under the terms of DOC Policy 600.020, Offender Paid Health Care.

Dkt. 51 at 78.

In his initial response to Defendants' Motion, Plaintiff argues involvement in the grievance process provides a "fuller context for the events as they unfolded" but concedes none of his claims are based solely on involvement in the grievance process. Dkt. 162 at 11. Arguing a different theory in his Supplemental Response, Plaintiff argues Defendant Hammond played a "central" role in the grievance process as Defendant Hammond was repeatedly named regarding inadequate treatment. Dkt 176 at 5 (citing Dkt. 51 at 76-78). Plaintiff argues Defendant Hammond failed to conduct any sort of reasonable investigation into the response to Plaintiff's grievances despite his knowledge that it was not medically acceptable to deny treatment. Dkt. 176 at 5. Plaintiff now argues Defendant Hammond was notified, through Plaintiff's grievances, of his extrahepatic symptoms. Dkt. 176 at 11 (citing Dkt. 51 at 77 ("I'm suffering 80% loss of energy & have excruciating pain from increasing headaches, fatigue, dizziness, forgetfulness affecting my ability to concentrate & my behavior has dramatically changed, with having unexplained episodes of violence. The symptoms are evident in my medical file & are listed as warning signs in the HCV Support Project.")).

Allegations arising from a defendant's actions in reviewing and/or denying administrative appeals typically do not constitute constitutional violations. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) ("Inmates lack a separate constitutional entitlement to a specific prison grievance procedure."). However, allegations that a defendant failed to adequately respond to a prisoner's serious medical needs, after being made aware of them through the administrative

1    appeals process, may state a cognizable Eighth Amendment claim. *See Jett*, 439 F.3d at 1097–98

2    ("prison administrators are liable for deliberate indifference when they knowingly fail to respond

3    to an inmates requests for help"). If the administrative or supervisory defendant "knew of an

4    ongoing constitutional violation and ... had the authority and opportunity to prevent the ongoing

5    violation," yet failed to act to remedy the violation, then the defendant may be held liable under

6    § 1983. *Herrera v. Hall*, 2010 WL 2791586 at *4 (E.D. Cal. July 14, 2010) (unpublished) (citing

7    *Taylor*, 880 F.2d at 1045), *report and recommendation adopted*, 2010 WL 3430412 (E.D. Cal.

8    Aug. 30, 2010).

9         Even assuming Defendant Hammond's role in the grievance process and responding to

10    Plaintiff's letters could demonstrate personal participation in denying Plaintiff adequate medical

11    treatment, there is no evidence in the record Defendant Hammond attributed the symptoms

12    reported in Plaintiff's grievances or letters to a rapid progression of Plaintiff's HCV which would

13    warrant immediate treatment with DAAs. Defendant Hammond testified loss of energy and

14    fatigue can be associated with chronic HCV infection, but Defendant Hammond did not attribute

15    Plaintiff's "rendition of symptoms" to indicate a rapid progression of the disease as the

16    "symptoms he described are either not common extrahepatic symptoms or they are so non-

17    specific (such as fatigue and loss of energy ….) that they could be associated with many

18    conditions or they are listed as symptoms that Mr. Reed speculated might occur at some

19    unknown point in the future." Dkt. 109 at 5-6. *See Vanjani,* 2018 WL 4053458 at *11–12.  And

20    even if Defendant Hammond erroneously attributed Plaintiff's complaints as not related to HCV

21    or non-specific and associated with other conditions, a merely negligent interpretation of

22    symptoms is not enough to show deliberate indifference absent some other evidence of

23

24

1 │ Defendant's subjective intent. *Toguchi*, 391 F.3d at 1060; *Wilhelm*, 680 F.3d at 1122-23; *See*

2 │ *Estelle*, 429 U.S. at 106.

3 │       Further, even considering Dr. Gish's expert testimony, which Plaintiff argues shows

4 │ Defendant Hammond's actions were medically unacceptable, the interpretation of these

5 │ symptoms of fatigue, pain, headaches, dizziness, forgetfulness, and episodes of violence, is not

6 │ clear in Dr. Gish's expert report. Dr. Gish does not reference Defendant Hammond's role in the

7 │ grievance process or Plaintiff's complaints of fatigue, pain, headaches, dizziness, forgetfulness,

8 │ and episodes of violence, or state an opinion as to these symptoms. *See* Dkt. 165, Gish Decl. at

9 │ 20-23. Rather, Dr. Gish opined Plaintiff presented "subtle markers" based on Plaintiff's

10 │ chemistry and laboratory tests and it would be "highly variable" as to whether another medical

11 │ provider would attribute those indications to a rapid progression of Plaintiff's HCV infection.

12 │ Dkt. 161, Gish Dep. at 7-8.

13 │       Plaintiff does not set forth evidence to suggest Defendant Hammond had subjective

14 │ knowledge of any risk based on Plaintiff's complaints through the grievance process or that he

15 │ consciously disregarded that risk. A mere mistaken diagnosis does not give rise to a

16 │ constitutional claim. Therefore, the Court concludes Plaintiff has failed to demonstrate a genuine

17 │ issue of material fact and recommends Defendants' Motion be granted as to this claim.

18 │      5.  Failure to use a Fibroscan

19 │       Defendants argue the failure to use a Fibroscan to detect the progression of Plaintiff's

20 │ HCV fails in light of Supreme Court precedent. Dkt. 160 at 15-16. Plaintiff argues he does not

21 │ have a "Fibroscan" claim, but rather these are allegations which will be presented to the jury in

22 │ the form of evidence and are not standalone claims. Dkt. 162 at 13-15.

23

24

1   To the extent this allegation is merely "evidence" and not a standalone claim, the Court

2   has extensively discussed Defendants' participation, or lack thereof, in making treatment

3   decisions related to Plaintiff's HCV. To the extent the failure to use a Fibroscan can be read as

4   separate basis for liability, the failure to order a specific test is at least a difference of medical

5   opinion and at most, negligent. *See Estelle*, 429 U.S.at 107 ("[b]ut the question whether an X-ray

6   or additional diagnostic techniques or forms of treatment is indicated is a classic example of a

7   matter for medical judgment. A medical decision not to order an X-ray, or like measures, does

8   not represent cruel and unusual punishment.").

9   Therefore, the Court recommends Defendants' Motion be granted as to this claim.

10   6.   Failure to Monitor, Failure to Review Treatment Priorities – Defendants
         Hammond, Strick, and (Smith) Kariko

11

12   Defendants argue they were not personally responsible for monitoring Plaintiff's

13   condition in 2016 or failing to conduct a review of treatment priorities. Dkt. 160 at 13-15. In his

14   original response, as with the failure to use a Fibroscan, Plaintiff argues the failure to monitor

15   and failure to review treatment priorities are not standalone claims, but rather evidence which

16   will be presented to the jury. Dkt. 162 at 13-14. In his Supplemental Response, Plaintiff argues

17   Defendants' job descriptions required them to review Plaintiff's medical history and current

18   treatment plan. Dkt. 176 at 14.Plaintiff must demonstrate that each defendant personally

19   participated in the deprivation of his rights. *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir.2002).

20   Each government official, regardless of his or her title, is only liable for his or her own

21   misconduct, and therefore, Plaintiff must demonstrate that each defendant, through his or her

22   own individual actions, violated Plaintiff's constitutional rights. *Ashcroft v. Iqbal,* 566 U .S. 662,

23   676 (2009).

24

It is undisputed Defendant Hammond was the CMO at the DOC from 2008 to July 2017.
Dkt. 109 at 2. Defendant Hammond's position was not clinical but administrative, and he was
tasked with the responsibility "to oversee the quality and safety and appropriateness of
healthcare delivered in the Washington State Prison System." Dkt. 164-1, Exhibit A, Hammond
Dep. at 16. He was the clinical supervisor for Defendant (Smith) Kariko, Defendant Strick, and
Ms. Eschbach. *Id.* at 17, 44. Defendant Hammond did not work at SCCC, where Plaintiff was
housed during the relevant time at issue in this case. Dkt. 109 at 6. Defendant Hammond worked
at DOC headquarters in Tumwater, Washington. Dkt. 109 at 6. All monitoring is performed at
the patient's facility. Dkt. 109 at 6. It is further undisputed Defendant (Smith) Kariko was the
FMD at SCCC. Dkt. 110 at 1. Defendant (Smith) Kariko was not Plaintiff's primary care
provider, but authorized various diagnostic tests and consultations in her position as FMD. Dkt.
110 at 2.  Defendant Strick is the Washington DOC's s Infectious Disease Physician and was not
Plaintiff's primary care provider. Dkt. 51-3 at 25. Defendant Strick testified "[m]onitoring of
HCV patients was and is accomplished by having an infection prevention nurse and/or the
primary provider at the patient's facility use the HCV treatment eligibility evaluation form to re-
evaluate annually." Dkt. 70, Strick Decl., at 4.

Plaintiff refers to Defendants' job responsibilities as evidence of personal participation,
but such general allegations of supervisory responsibility do not establish a constitutional
violation. Rather, in a § 1983 action, "supervisory officials are not liable for actions of
subordinates on any theory of vicarious liability." *Hansen v. Black*, 885 F.2d 642, 645-46 (9th
Cir. 1989) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). A supervisor may
only be liable "if there exists either (1) his or her personal involvement in the constitutional
deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and

the constitutional violation." *Id.* at 646 (citation omitted); *Ashcroft v. Iqbal,* 566 U .S. 662, 676

(2009) (Government officials, however, "may not be held liable for the unconstitutional conduct

of their subordinates under a theory of *respondeat superior.* ").

Plaintiff asserts Defendant Hammond was responsible for *all* aspects of Plaintiff's care

by virtue of his position, but the evidence demonstrates Defendant Hammond's role was

administrative and was not involved in, and had no casual connection to, the treatment provided

to Plaintiff by SCCC staff after the January 2016 CRC decision and responding to Plaintiff's

letters and grievances. Similarly, Plaintiff fails to identify any medical decision by Defendant

Strick indicating she was responsible for care and treatment of Plaintiff's HCV after the January

2016 CRC decision. To the extent Defendant Strick's job description is to help supervise the

infection control nurses and act as a medical consultant if an issue arises, there is no evidence in

the record Defendant Strick was required to monitor *all* HCV patients, particularly those not

directly under her care. Dkt. 51-3 at 26. Prison officials who are not medical providers are not

deliberately indifferent when they defer to the judgment of treating medical providers. *See*

*Spruill v. Gillis,* 372 F.3d 218, 236 (3rd Cir. 2004); *Hayes v. Snyder,* 546 F.3d 516, 526–28 (7th

Cir. 2008); *cf. Peralta v. Dillard,* 744 F3d 1076, 1086–87 (9th Cir. 2014) (non-specialist doctor

was not deliberately indifferent when he deferred to specialist).

With respect to Defendant (Smith) Kariko, there is no evidence she participated in the

2016 CRC decision or any future treatment recommendations. *See id.* Defendant (Smith) Kariko

testified it was not within her role as the FMD to monitor the progression of Plaintiff's HCV. *Id.*

at 3. Defendant (Smith) Kariko testified she was not aware in 2016 Plaintiff's condition was

worsening or progressing rapidly and conducting a review upon the protocol change "did not

occur to her" because HCV is typically a slow to progress disease. *Id.* at 3. Rather, the evidence

1    reflects Ms. Eschbach was responsible for monitoring Plaintiff's condition in accordance with

2    the DOC HCV protocol. Dkt. 71 at 2. Thus, "[b]ecause vicarious liability is inapplicable to" suits

3    brought pursuant to 42 U.S.C. § 1983, and Plaintiff has not set forth evidence each Defendant,

4    through their own individual actions, failed to monitor Plaintiff or failed to review treatment

5    priorities, he has not established an Eighth Amendment violation.

6        To the extent Plaintiff argues the HCV Policy changed in 2016, and Defendants should

7    have done more to ensure Plaintiff received treatment sooner, this does not establish Defendants

8    had subjective knowledge that Plaintiff faced a substantial risk due to a lack of additional

9    monitoring or reviewing treatment priorities. Plaintiff has not cited to any evidence Defendants

10   Hammond, Strick, or (Smith) Kariko drew an inference that a substantial risk of harm existed if

11   Plaintiff did not receive treatment with DAAs immediately. Accordingly, "absent a reason to

12   believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not

13   treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth

14   Amendment scienter requirement of deliberate indifference." *Spruill,* 372 F.3d 236*; see also*

15   *Hayes,* 546 F.3d at 527–28 ("Because the non-medical defendants were entitled to rely on the

16   professional judgment of medical prison officials, and because nothing in [the prison medical

17   provider's] reports made it obvious that [the inmate] might not be receiving adequate care, the

18   district court correctly granted summary judgment in favor of the non-medical defendants.").

19   Rather, Plaintiff attempts to sidestep the subjective knowledge requirement by arguing individual

20   Defendants were liable solely based on their job description and supervisory liability, which is

21   unavailing.

22

23

24

1     Therefore, the Court finds Plaintiff has failed to defeat summary judgment on as to his

2  failure to monitor and failure to review treatment priorities the basis of the individual

3  Defendants' job descriptions or awareness of a policy change alone.[18]

4     **D.  Qualified Immunity**

5     Because the undersigned has recommended granting summary judgment in favor of all

6  Defendants as to all remaining claims, it need not reach additional qualified immunity arguments

7  advanced by the defense.

8     **E.  State Law Claims**

9     On January 13, 2020, the Court allowed Plaintiff's medical negligence claims under

10  Washington law to go forward. Dkt. 147. Defendants make the same argument as to whether the

11  law should be applied prospectively in order to preserve it for appeal. Dkt. 160 at 19. Next,

12  Defendants argue they are entitled to qualified immunity under Washington law, and Plaintiff's

13  medical negligence claims fail as a matter of law because Plaintiff cannot establish proximate

14  cause linking any Defendant's care to an injury. Dkt. 160 at 21-24. Plaintiff argues state law

15  qualified immunity does not apply to medical providers and the evidence of medical negligence

16  is sufficient to defeat summary judgment. Dkt. 162 at 23.

17     Where there are pendent state claims remaining after federal claims have been dismissed,

18  this court has the discretion to decline jurisdiction. 28 U.S.C. § 1367(c)(3). As the 42 U.S.C. §

19  1983 claims have been dismissed, no federal claims remain. The negligence claims are clearly

20  state law claims, governed by RCW 7.70, *et seq.* Matters of negligence under state law are more

21

22

---

23     [18] The Court notes Judge Settle previously found, "the Court is satisfied that a constitutional violation has occurred if the intentional delay in treating Plaintiff's HCV was prolonged for an extra year because Defendants failed to properly provide an annual evaluation in 2016 . . . ," Dkt. 62, at 11. However, as discussed herein, none of

24  the named Defendants were responsible for the failure to monitor or provide an annual evaluation in 2016.

1  properly decided by the state courts. *United Mine Workers of America v. Gibbs,* 383 U.S. 715,

2  726 (1966); *McKinney v. Carey,* 311 F.3d 1198, 1200 (9th Cir. 2002). Therefore, the Court

3  declines supplemental jurisdiction. The Court recommends dismissing Plaintiff's state law

4  claims without prejudice to proceeding against Defendants in state court. *See Downing v.*

5  *Clinton,* 2006 WL 3054314, at *20 (E.D. Wash. Oct. 26, 2006).

6                                                 **CONCLUSION**

7           The undersigned recommends granting Defendants' request to strike the new evidence

8  contained in Plaintiff's Supplemental Response, and the undersigned has not considered the new

9  evidence in this Report and Recommendation. The undersigned further recommends Defendants'

10  Third Motion for Summary Judgment be denied on the issue of exhaustion but granted as to

11  Plaintiff's Eighth Amendment deliberate indifference claims against Defendants Hammond,

12  Strick, and (Smith) Kariko. Plaintiff's claims against Defendants Hammond, Strick, and (Smith)

13  Kariko should be dismissed with prejudice. The undersigned recommends Defendant Weber be

14  dismissed with prejudice as Plaintiff no longer pursues any claims against him. The undersigned

15  recommends dismissing Plaintiff's state law claims without prejudice.

16

17

18

19

20

21

22

23

24

1       Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

2 fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

3 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

4 review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

5 imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on May

6 7, 2021, as noted in the caption.

7

8       Dated this 16th  day of April, 2021.

9

10                            David W. Christel

11                            United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24